1999-NMSC-039

990 P.2d 197

Christine GABALDON, individually and as next friend of her minor children, Victor Baldizan and Charlene Baldizan, Plaintiffs–Respondents,

v.

ERISA MORTGAGE COMPANY, jointly and severally, Defendant–Petitioner.

Christine Gabaldon, individually and as next friend of her minor children, Victor Baldizan and Charlene Baldizan, Plaintiffs–Petitioners,

v.

Erisa Mortgage Company, jointly and severally, Defendant–Respondent.

No. 24,788, 24,791.

Supreme Court of New Mexico.

Oct. 7, 1999.

See also, 122 N.M. 393, 925 P.2d 510.

Lassen & Jaffe, Albert B. Lassen, Albuquerque, for Gabaldon.

Gallagher, Casados & Mann, P.C., J.E. Casados, Reed S. Sheppard, Robert L. Hlady, Albuquerque, for Erisa Mortgage Company.

## OPINION

BACA, Justice.

{1} Pursuant to NMSA 1978, § 34–5–14(B)(4) (1972), on certiorari from the Court of Appeals, we consider: 1) whether the operation of a wave pool is an inherently dangerous activity, and 2) whether plaintiffs may maintain an action against a non-possessory landlord under a negligent entrustment theory of liability. We affirm the Court of Appeals' holding that the operation of wave pools is not an inherently dangerous activity. However, we reverse the Court of Appeals to the extent that we hold that negligent entrustment of real property by a non-possessory landlord is not a cause of action recognized under New Mexico law.

### I.

{2} This action grows out of a near-drowning incident at the Beach Waterpark ("the Beach") in Albuquerque on June 21, 1993. The Beach is a water park that features various water attractions including a 700,000 gallon wave pool with mechanically-operated hydraulic machines simulating ocean-type waves of varying intensities.

{3} After Erisa Mortgage Company ("Erisa") acquired the Beach through a loan foreclosure it sought to find a lessee to manage and operate the property. Jay–Bi Property Management Inc. ("Jay–Bi") and its owner, Jay Bomaster, initially rejected Erisa's lease offer for the Beach citing inadequate financial resources. Later, after meeting with Erisa's agents, Jay–Bi and Erisa entered into a lease agreement in April 1991. Clause III of the lease agreement granted Erisa a percentage of Jay–Bi's gross receipts. Erisa also reserved rights to repair and inspect the Beach and to approve such activities by Jay–Bi. Jay–Bi employed Ellis and Associates as its water safety consultants but in June 1993, a short time before the near-drowning incident, Bomaster fired Ellis and Associates claiming that the costs for their services were unreasonable.

{4} The drowning incident occurred one half-hour after the Beach opened on June 21, 1993. Lifeguards found nine-year old Victor Baldizan floating face down near the bottom of the wave pool without a pulse. Medical personnel resuscitated Victor and transported him to the hospital. According to witness testimony, approximately three minutes had elapsed before lifeguards found Victor. He was not revived for several minutes after lifeguards found him.

{5} Christine Gabaldon ("Gabaldon") filed a personal injury action against Jay–Bi and other parties on behalf of her son, Victor, claiming that he had suffered permanent brain injuries due to oxygen deprivation. Gabaldon later joined Erisa as a party and in her second amended complaint claimed that the operation of a wave pool is an inherently dangerous activity and that Erisa breached its duty to select a competent lessee by negligently entrusting the Beach to Jay–Bi. Erisa moved for dismissal, or in the alternative, for summary judgment, arguing that a wave pool is not inherently dangerous and that Gabaldon failed to state a claim upon which relief may be granted. The district court granted Erisa's motion for summary judgment and dismissed each cause of action against Erisa with prejudice. Gabaldon appealed.

{6} The Court of Appeals affirmed the district court's dismissal of Gabaldon's claim that wave pools were inherently dangerous but reversed the dismissal of the negligent

entrustment claim, holding that it was a proper theory under which to seek relief and that questions of fact existed which precluded summary judgment. *See Gabaldon v. Erisa Mortgage Co.*, 1997–NMCA–120, ¶ 50, 124 N.M. 296, 949 P.2d 1193. We granted certiorari to address the issues of whether the operation of a wave pool is an inherently dangerous activity and whether negligent entrustment of real property is a valid cause of action under New Mexico law that requires a duty to investigate a lessee's ability to safely operate the leased premises.

## II.

■ {7} Determining whether an activity is inherently dangerous is a question of law.[1] *See Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 395–96, 398, 827 P.2d 102, 110–11, 113 (1992). Also whether a plaintiff alleges a valid theory upon which relief may be granted is a pure question of law. All questions of law are reviewed de novo. *See Fernandez v. Walgreen Hastings Co.*, 1998–NMSC–039, ¶ 1, 126 N.M. 263, 968 P.2d 774.

{8} In this case, the Court of Appeals correctly stated that, "[g]iven the public policy implications of a determination of inherently dangerous activit[ies] . . . an independent review of the record is . . . appropriate in this case." *See Gabaldon*, 1997–NMCA–120, ¶ 11, 124 N.M. 296, 949 P.2d 1193. Accordingly, this Court must decide whether the facts in the record before us give rise to a determination that wave pool operation is an inherently dangerous activity.

■ {9} In reviewing the district court's award of summary judgment, "we must determine whether the moving party has demonstrated that there are no genuine issues of material fact and is therefore entitled to judgment as a matter of law." *Gonzales v. Allstate Ins. Co.*, 1996–NMSC–041, 122 N.M. 137, 139, 921 P.2d 944, 946; *see also* Rule 1–056(C) NMRA 1999.

## III.

■ {10} Gabaldon claims that the operation of a wave pool is an inherently dangerous activity and that as landlord and owner of the Beach, Erisa had a nondelegable duty to ensure the safety of its wave pool patrons. The crux of Gabaldon's argument is that wave pools are inherently dangerous if adequate safety precautions are not taken. In support of this contention, Gabaldon points to the following facts as evidence that Jay–Bi failed to take the precautions necessary to prevent the wave pool from increasing the risk of harm to Beach patrons: 1) Jay–Bi fired the Beach water safety consultant, Ellis and Associates, in June 1993; 2) after firing Ellis and Associates, Jay–Bi failed to spend money on independent training and water safety auditing despite a critical safety audit that cited a lack of concern for water safety; 3) Jay–Bi required its lifeguards to pay for their own continuing education training; and 4) there was an overall lack of concern for aquatic safety matters at the Beach.

{11} Gabaldon's analysis of the "inherent danger" posed by wave pools includes an affidavit of Thomas Ebro, plaintiff's expert in the area of water safety and aquatic risk management, and two excerpts from articles by Jeff Ellis of Ellis and Associates, which was employed by the Beach as an independent trainer, consultant, and auditor. Ebro's affidavit comparing the risks of swimming pools and wave pools states:

> Because of either oscillating or sweeping waves inside the expansive basin and coupled with typically heavy congestion of bathers floating on a carpet of tubes, a wave pool is considerably more difficult to safeguard than a swimming pool. Water movements and undertows are very tiring for swimmers and can cause disorientation and slips and falls. Collisions are another cause of injuries unique to wave pools— body to body, body to basin and body to wave. With congestion of floating tubes/ rafts and swimmers intermingled, the lifeguards' line of sight is often impaired. Wave pools, comparatively, pose an in-

---

1. Even though determination of whether an activity is inherently dangerous is a question of law, "we recognize that there may be gray areas requiring fact-finding." *Saiz*, 113 N.M. at 396, 827 P.2d at 111.

creased risk of aquatic injury, including potential for drowning, over swimming pools.

Ellis' National Aquatics Journal article stated that the characteristics of wave pools, as opposed to swimming pools, demanded different "training regimens and standards of lifeguard performance." Ellis states that lifeguards execute far more wave pool rescues than lifeguards at swimming pools and should therefore receive extensive training in victim recognition. He adds that failed water safety audits may also result in park closure. The adoption of these safety standards and precautions, Ellis states, result in only one drowning death per 3.7 million visits as compared to one drowning for every 280,-000 visits to a swimming pool.

{12} We agree with the Court of Appeals' conclusion that "while wave pools present different risks from those found in ordinary swimming pools, the risks do not meet the *Saiz* test" to determine whether an activity is inherently dangerous. *Gabaldon,* 1997–NMCA–120, ¶ 15, 124 N.M. 296, 949 P.2d 1193. In *Saiz,* this Court addressed the issue of inherently dangerous activities where a child was electrocuted at a high school football game by an improperly installed high voltage lighting system. *See Saiz,* 113 N.M. at 391, 827 P.2d at 106. We held that installation of a high voltage lighting system was an inherently dangerous activity and accordingly, that the school district had a nondelegable duty to ensure that reasonable precautions were taken in connection with the independent contractor's inherently dangerous work. *Id.* at 400, 827 P.2d at 115. We concluded that the defendant school district was jointly and severally liable[2] with the independent contractor it had employed to install the lighting system for its "failure to take precautions reasonably necessary to prevent injury to third parties arising from the peculiar risk." *Id.*

█ {13} *Saiz* stated that when determining whether an activity is inherently dangerous, the Court must consider whether "work is inherently or intrinsically dangerous because the commission of the work . . . is

likely to cause harm if a reasonable precaution against the peculiar risk or special danger is not taken." *Id.* at 396, 827 P.2d at 111 (citing *Deitz v. Jackson,* 57 N.C.App. 275, 291 S.E.2d 282, 286 (1982)). Although *Saiz* did not delineate a specific "checklist," subsequent cases have attempted to standardize the criteria used to determine whether an activity is inherently dangerous. *See Enriquez v. Cochran,* 1998–NMCA–157, ¶ 91, 126 N.M. 196, 967 P.2d 1136; *Gabaldon,* 1997–NMCA–120, 124 N.M. 296, 949 P.2d 1193. Accordingly, we adopt the following three-prong test to determine whether an activity is inherently dangerous: 1) the activity must involve an unusual or peculiar risk of harm that is not a normal routine matter of customary human activity; 2) the activity is likely to cause a high probability of harm in the absence of reasonable precautions; and 3) the danger or probability of harm must flow from the activity itself when carried out in its ordinary, expected way, such that reasonable precautions aimed at lessening the risk can be expected to have an effect. *See Enriquez,* 1998–NMCA–157, ¶¶ 93–99, 126 N.M. 196, 967 P.2d 1136; *see also Gabaldon,* 1997–NMCA–120, ¶ 10, 124 N.M. 296, 949 P.2d 1193.

█ {14} The first prong "addresses the relative rarity of the activity and the concomitant lack of contact or experience with the activity and its dangers by the general public." *Enriquez,* 1998–NMCA–157, ¶ 93, 126 N.M. 196, 967 P.2d 1136. Thus, if an activity is a "common, every-day occurrence" and the public is familiar with the dangers associated with that activity, the activity is not inherently dangerous. *See id.* at ¶ 93.

{15} In *Saiz,* the Court stated that the high voltage electrical supply line in an area of public accommodation created a peculiar risk of physical harm. Describing the properties of the danger, the Court stated, "[i]t would seem beyond dispute that electricity has certain well-known inherent dangers. It gives no warning of its presence, and if amperage and voltage are sufficiently high, its discovery can be attended by fatal conse-

---

2. The Court however, found that the school district was immune from liability under the Tort Claims Act. *See Saiz,* 113 N.M. at 402, 827 P.2d at 116.

quences [and we] do not regard possible exposure to [high-voltage currents] ... a matter of routine human activity." *Saiz,* 113 N.M. at 398, 827 P.2d at 113. Similarly, in *Enriquez,* the Court stated that the felling of large dead trees posed peculiar risks because of the "size and weight of the trees, as well as the unpredictability of their behavior while actually falling." 1998–NMCA–157, ¶ 98, 126 N.M. 196, 967 P.2d 1136.

{16} Applying this prong to the facts of this case, we cannot conclude that wave pools are so unusual as to create a peculiar risk of harm. Indeed, Gabaldon's own experts indicate that across the United States, wave pool parks receive between 125,000 and 800,000 visitors per year. Assuming the accuracy of these numbers, they do not indicate a lack of public contact or experience with the wave pools. *See id.* ¶ 93. Gabaldon attempts to argue that because the wave park is in New Mexico, an arid state, that visitors would be less likely to appreciate the dangers of waves and massive water parks. We find this argument unpersuasive because it is unsupported by any evidence in the record. In addition, wave pools, like swimming pools, offer warning of the dangers associated with their use—unlike high voltage electricity. Drowning as a result of pool or wave pool use, despite the presence of lifeguards, is a widely understood risk as with most recreational water activities. Accordingly, we cannot conclude that wave pools create hazards "distinctly different from hazards to which persons commonly are subjected...." *Saiz,* 113 N.M. at 398, 827 P.2d at 113.

{17} Under the second prong, we must analyze the expected probability of harm associated with the activity. *Enriquez,* 1998–NMCA—157, ¶ 95, 126 N.M. 196, 967 P.2d 1136. To support a finding that an activity is inherently dangerous, "there must be a high risk or probability of harm in the absence of reasonable precautions." *Id.* On this point, we find the Court of Appeals' reasoning in *Gabaldon* persuasive. There, the Court stated that although wave pools might indeed have a greater risk of harm than ordinary swimming pools, "the increased risks potentially posed by wave pools are not sufficiently great to require, as a matter of public policy, application of a legal rule more stringent than ordinary negligence." *Gabaldon,* 1997–NMCA–120, ¶ 15, 124 N.M. 296, 949 P.2d 1193. The Court of Appeals also stated that "application of ordinary negligence rules adequately encourages reasonable and sufficient safeguards against the risks posed [by wave pool operations]." *Id.* (citing *Saiz,* 113 N.M. at 398, 827 P.2d at 113).

{18} Gabaldon claims that statistically, wave pools are much more dangerous than ordinary swimming pools. According to Ellis, while there are typically ten life guard rescues per year at swimming pool, a wave pool may have as many as 700 per season. It appears however, that Gabaldon's expert's statistics also support the conclusion that wave pools are actually relatively safe. These statistics indicate that ordinary swimming pools average one drowning per 280,000 visits while wave pools only average one drowning per 3.7 million visits. Assuming the accuracy of Ellis' figures, the drowning rate at wave pools is significantly lower than at swimming pools despite hosting seven to twenty-six times the number of swimmers per year. Although we need not wait until a disproportionate amount of accidents occur, before we can label an activity inherently dangerous, Gabaldon's expert's statistics, without more, do not implicate wave pools as inherently dangerous. As such, we agree with the district court's conclusion in its summary judgment order that:

> [w]hile a wave pool may not be a swimming pool under the facts as alleged, the wave pool may create a potentially hazardous situation but not an inherently dangerous condition. Causing injury in a wave pool is not relatively certain to occur while lifeguards are provided as a reasonable precaution against the possibility of drowning. The activity of being in the wave pool is itself not highly likely to result in injury if that precaution is not taken.

Although there may be more risks associated with wave pools than swimming pools, we do not find sufficiently great dangers associated with this activity, even in the absence of reasonable precautions, to classify it as inherently dangerous. *See also Seal v. Carls-*

*bad Indep. Sch. Dist.,* 116 N.M. 101, 104, 860 P.2d 743, 746 (1993).

{19} The third prong requires analysis of the source of the harm, specifically: does the risk of harm flow from the activity itself when carried out in an ordinary expected manner or does the harm result from the negligence of a particular actor? *See Enriquez,* 1998–NMCA–157, ¶ 97, 126 N.M. 196, 967 P.2d 1136. As the *Enriquez* court notes, the "[d]amages caused by an actor's negligence in the operative details of the activity—such as failure to conduct routine maintenance on machinery used in conducting the activity—will not by themselves trigger liability, whether vicarious or direct ..." Thus the risk of harm must flow from the activity itself when carried out in an ordinary expected manner. *Id.* ¶ 97 (citing *Saiz,* 113 N.M. at 397, 827 P.2d at 112).

{20} The risk of injury in wave pools, although certainly a potential hazard does not appear to have resulted from an inherent danger in the ordinary, expected operation of wave pools. Although Gabaldon's expert's conclusions appear to indicate that the risk of harm flows from the use of wave pools, most of Gabaldon's allegations refer to specific acts or omissions by Jay–Bi and its agents. Accordingly, Gabaldon's claim that the wave pool was not functioning properly, that the lifeguards were poorly trained, and that the Beach did not have a safety auditing program in place in June 1993, do not by themselves trigger Erisa's liability.

{21} For the foregoing reasons, we conclude that operation of a wave pool is not an inherently dangerous activity and affirm the Court of Appeals' ruling on this issue.

### IV.

{22} Gabaldon's second amended complaint asserted that Erisa "had a duty to select a competent, careful lessee or concessionaire to operate the Wave Pool at The Beach as a public amusement" and also "had a duty to provide in any contract ... that the lessee or concessionaire must take special precautions to protect users of the Wave Pool from the peculiar risk of harm presented." Gabaldon alleged that Erisa breached its duty by leasing the Beach to Jay–Bi because Bomaster lacked experience operating wave pools, was undercapitalized, under-insured, and did not employ safety consultants at the time of the near-drowning incident. Gabaldon claimed that Bomaster refused to accept Erisa's initial lease offer because he knew that he lacked sufficient capital, assets, and insurance to safely lease and operate the Beach. Gabaldon also cited Bomaster's lack of experience, alleging that Bomaster had previously only operated a food stand as a concessionaire and worked at other food service operations in bars and bowling alleys. Finally, Gabaldon stated that Erisa failed to demonstrate any concern about risk management or aquatic safety and that no professional water safety programs were in place after Bomaster fired Ellis and Associates, the Beach's safety consultants, in June 1993. These deficiencies, Gabaldon argued, indicate that Erisa "knew or should have known that the peculiar risks and likelihood of injury to users involved in the operation of the Wave Pool at The Beach could reasonably result in a catastrophic injury."

{23} The Court of Appeals agreed with Gabaldon, reversing the district court's grant of summary judgment in favor of Erisa, and held that a landlord owes a duty of care in selecting a competent lessee or concessionaire "when the landlord is in effect requiring, or allowing, another to undertake an activity ... for [the] landlord's economic benefit" and where "the property is designed, intended and required to be used for a particular purpose, and the use has highly dangerous potentialities involving a substantial risk to the general public, and such danger or risk to the public is such that it may be foreseen by the lessor." *Gabaldon,* 1997–NMCA–120, ¶ 46, 124 N.M. 296, 949 P.2d 1193 (quoting *Benlehr v. Shell Oil Co.,* 62 Ohio App.2d 1, 402 N.E.2d 1203, 1209 (1978)) (internal quotes omitted). The Court of Appeals also held that because Erisa knew or should have known about the potential for injury associated with wave pools, ordinary care standards required that Erisa should have investigated the "knowledge and experience [that] potential tenants had in management of wave pools." *Gabaldon,* 1997–NMCA–120, ¶ 45,

124 N.M. 296, 949 P.2d 1193. Thus, the Court of Appeals' opinion establishes a heretofore unrecognized cause of action for negligent entrustment of real property by a non-possessory landlord as well as requiring an affirmative duty of landlords to investigate their potential tenant's ability to safely operate the leased premises.

### A.

{24} We do not disagree in principle with the establishment of such a new cause of action; however we disagree with the Court of Appeals' holding on several grounds. First, the holding advances a new theory of tort liability unsupported by legal authority. Second, the Court of Appeals' opinion urges adoption of a standard that is irreconcilable with its other holding regarding inherently dangerous activities. Finally, we believe that the new cause of action and duty to investigate the ability of a potential lessor to safely operate the leased premises does not offer parties, attorneys, and courts guidance in similar situations.

### 1.

{25} Prior to the Court of Appeals' holding, negligent entrustment of leased real property by a non-possessory landlord was not a recognized cause of action under New Mexico law. Furthermore, lessors of real property were under no obligation to investigate a potential tenant's ability to safely operate leased the premises. Standard negligent entrustment doctrine assigns liability to a defendant if they "permit a third person to use a thing or to engage in an activity which is under the control of the [defendant], if the [defendant] knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others." Restatement (Second) of Torts § 308 (1965) (hereinafter "Restatement"). Indeed, the Court of Appeals has acknowledged that there are no direct "statutory or regulatory provisions bearing on the issue of a landlord's obligation when selecting a tenant" and recognizes that in New Mexico,

negligent entrustment has been discussed only in the context of chattel entrustment. *Gabaldon*, 1997–NMCA–120, ¶¶ 22, 29, 124 N.M. 296, 949 P.2d 1193. As such, the Court of Appeals' holding represents a significant departure from current tort liability jurisprudence in New Mexico, for which we have an inadequate basis in either law or fact.

{26} Unable to rely on direct legal authority to support extension of negligent entrustment doctrine to real property leases, the Court of Appeals asserts that "non-possessory landlords occupy a relatively privileged position at common law with regard to liability for injuries suffered on the leased premises" and observes that the modern trend in landlord-tenant liability jurisprudence is to narrow the scope of the landlord's "traditional immunity." *Id.* ¶ 35. This trend, the Court of Appeals reasons, is compatible with the Restatement's discussion of negligent entrustment. We disagree.

{27} As a matter of course, we emphasize that the Restatement is merely persuasive authority entitled to great weight that is not binding on this Court. *See Proctor v. Waxler*, 84 N.M. 361, 364, 503 P.2d 644, 647 (1972). Furthermore, the Restatement makes no references to negligent entrustment of *real property*. Although the Court of Appeals acknowledges that negligent entrustment is discussed only in the context of chattels, it highlights the absence of any language in the Restatement specifically precluding application of negligent entrustment doctrine to real property leases. *See Gabaldon*, 1997–NMCA–120, ¶ 26, 124 N.M. 296, 949 P.2d 1193. We agree with Erisa's argument that the mere "lack of a prohibition does not constitute a mandate to create new duties or to apply old duties in new contexts."

{28} Also, the conclusion that non-possessory landlords occupy a privileged position or enjoy a "traditional immunity" is misplaced. Although exceptions to the general rule that landlords are not liable for injuries suffered on the leased premises exist, the Court of Appeals overlooks the significance of its own observation that the exceptions [3]

---

**3.** These exceptions include, for example, "(1)

when the landlord knows of a hidden defect and

only "concern themselves with the landlord's liability for acts directly connected with the physical condition of the leased premises, or the lack thereof, to remedy unsafe conditions on the premises after possession passes to the tenant." *Gabaldon,* 1997–NMCA–120, ¶ 34, 124 N.M. 296, 949 P.2d 1193.

{29} In further support of their argument that trends in landlord tort liability are narrowing landlords' privileges and traditional immunities, the Court of Appeals cites to Restatement § 318 ("Duty of Possessor of Land or Chattels to Control Conduct of Licensee") which stands for the proposition that "a landlord can be required to guard against the acts of others on the property." *Gabaldon,* 1997–NMCA–120, ¶ 36, 124 N.M. 296, 949 P.2d 1193. Overlooked is the general premise that the landlord must be a *possessor* to have some duty to control the conduct of a licensee. Although Clause III of the lease agreement granted Erisa "a percentage of Jay–Bi's gross receipts and Erisa also reserved rights to repair, inspect [the Beach] and to approve such activities by Jay–Bi," there is no evidence that Erisa controlled the Beach. Erisa did not manage the day-to-day operations of the premises nor did it in any way control the activities occurring on the leased property. We find no evidence that Erisa was more than a non-possessory landlord. In addition, Restatement § 359(b) ("Land Leased for Purpose of Involving Admission of the Public"), which assigns liability to a lessor of land if "the lessor has reason to expect that the lessee will admit them before the land is put in safe condition for [the public's] reception," offers plaintiffs no solid argument. We note that there is no allegation, nor does our review of the record indicate, that the Beach was leased in an unsafe condition or that Erisa had reason to expect that Jay–Bi would admit the public to unsafe premises.

{30} Thus, the exceptions to the general rule of non-liability and references to Restatement sections outlining the duties of a *possessor* of property to control the activities of persons using its land provide no basis for the expansion of *non-possessory* landlords' duties. The Court of Appeals, referencing the Restatement, asserts that "because liability is based on the failure to act of a third person, [it] is analytically related to the theory of negligent entrustment, which simply requires the defendant to consider the consequences of allowing another person to use its chattels or pursue its activity." *Id.* ¶ 38. This assertion cannot satisfactorily explain the imposition of liability on non-possessory landlords in situations not falling within the exceptions carved out in traditional landlord tort liability. Indeed, as Erisa indicates, "the legal position of a non-possessory landlord is not one of immunity or privilege[, it] is simply the same legal position offered by sellers of property. They are simply not, as a matter of law, responsible for what takes place on land they do not possess, and do not have a right to control."

**2.**

{31} The Court of Appeals' opinion appears to contain internal inconsistencies that would render its holding that the operation of a wave pool is not an inherently dangerous activity incompatible with its holding that Erisa had a duty to investigate Jay–Bi's ability to safely operate the leased premises. The opinion unsuccessfully attempts to mesh two standards by using the same language to conclude that wave pools are *not* inherently dangerous as it does to identify which activities trigger a duty to investigate a potential lessee's ability to safely operate the leased premises.

{32} The Court of Appeals determined that Erisa had an obligation to exercise reasonable care in the selection of a tenant because "[w]e have already detailed the potential for *danger inherent* in [the] operation of a wave pool." *Gabaldon,* 1997–NMCA–120, ¶ 45, 124 N.M. 296, 949 P.2d 1193 (em-

does not communicate that knowledge to the tenant; (2) when the landlord binds himself by a covenant to repair; (3) when the landlord reserves control of part of the premises for common use by tenants and/or the public; (4) when the injury is to persons off the premises caused by the landlord's ordinary negligence; and (5) when the land is leased for purposes involving admission of the public." *See Lommori v. Milner Hotels, Inc.,* 63 N.M. 342, 346–47, 319 P.2d 949, 952 (1957).

phasis added). In addition, the Court of Appeals also states that "[w]here ... as here, the property is designed, intended and required to be used for a particular purpose, and the use has *highly dangerous* potentialities involving a substantial danger or risk to the general public, and such danger or risk to the public is such that it may be foreseen by the lessor, the lessor owes a duty of reasonable care in selecting and entrusting such property to a lessee." *Id.* ¶ 46 (citing *Benlehr,* 402 N.E.2d at 1209) (emphasis added) (internal quotation marks omitted). The inconsistencies of this standard are revealed when juxtaposed with the Court of Appeals' determination that wave pools are not inherently dangerous: "The risks posed by wave pools are not unusual or beyond the realm of normal everyday human expectations [and] we cannot say that the risk is so great that injury is probable." *Id.* ¶ 15.

{33} Thus, on one hand, the Court of Appeals concludes that wave pools are not inherently dangerous because the risk of harm is not probable. However, on the other hand, it concludes that wave pools involve "highly dangerous potentialities involving a substantial danger or risk to the general public" and ignores its earlier holding that wave pools are not inherently dangerous. The two standards are starkly opposed and incompatible.

{34} The Court of Appeals states that this new theory of liability only creates a duty of ordinary care in the selection of tenants. *See id.* ¶ 45. However in New Mexico, even in the context of chattel entrustments, ordinary care has not required a duty to investigate. *See Spencer v. Gamboa,* 102 N.M. 692, 694, 699 P.2d 623, 625 (Ct.App. 1985) (holding that car dealers are under no affirmative duty to learn the qualifications of customers when allowing test drives of automobiles). In the chattel entrustment context, only when the entrustor knew or should have known that the entrustee was not qualified to engage in the activity does a duty to investigate exist. *Cf. DeMatteo v. Simon,* 112 N.M. 112, 812 P.2d 361 (Ct.App.1991) (holding that an employer who failed to fully investigate a driver's record despite knowledge of several traffic citations negligently entrusted a vehicle); *McCarson v. Foreman,* 102 N.M. 151, 157, 692 P.2d 537, 543 (Ct.App. 1984) (holding that evidence of an employer's knowledge of an employee's DWI conviction and cocaine charges was sufficient to support a jury finding that employer negligently entrusted a vehicle).

**3.**

{35} A rule such as proposed by the Court of Appeals, seems, at first, a reasonable extension of New Mexico's tort jurisprudence, general negligence principles, and notions of fairness. As one case has stated, "[t]here is simply no case to be made consistent with reality as to why the law should not provide the public with a remedy against a landlord out of possession and control who rents a powder factory to a known pyromaniac." *Benlehr,* 402 N.E.2d at 1207. We are not unmindful of the appeal such a rule presents. However, although the Restatement and common law has "furnished established analogues and parallels to the principle sought to be established," our refusal to expand the doctrine of negligent entrustment also derives from the uncertainty in the law that the new cause of action and new duty to investigate creates. *Id.* The Court of Appeals' proposed rule provides little guidance as to exactly when and how the duty to investigate a lessee's capacity to safely operate the leased premises should be invoked. The Court of Appeals' language limiting the duty to situations where "the property is designed, intended, and required to be used for a particular purpose, and the use has highly dangerous potentialities involving a substantial risk to the general public," especially given its earlier discussion that wave pools are not inherently dangerous, does not provide sufficient demarcations that identify when the duty is triggered. *Gabaldon,* 1997–NMCA–120, ¶ 46, 124 N.M. 296, 949 P.2d 1193. Furthermore, the Court of Appeals' assertion that "absent specific, compelling facts most real estate lease transactions will not implicate a duty to investigate the background of potential lessees" does not assuage our fear that parties to a lease transaction will not be reasonably certain of their duties and potential liabilities. *See id.* It is not difficult to anticipate this Court being called

upon to clarify exactly what "specific, compelling facts" would give rise to such a duty and which types of property could be considered as creating "highly dangerous potentialities."

{36} In addition, even had Erisa investigated Jay–Bi, it is still unclear, based upon the Court of Appeals' opinion, what factors would have qualified Jay–Bi as a "safe" tenant. Would six months of previous water park experience be sufficient? Three years? The record indicates that Bomaster had managed the Beach for at least one season before entering the lease agreement with Jay–Bi. Without specific guidelines, landlords will likely be unable to conform their conduct in a manner that would reasonably assure them that they would be insulated from liability when selecting a tenant.

{37} Furthermore, to accept the Court of Appeals' holding, would "unwittingly impose unreasonable and uncertain duties." Robert M. Howard, *The Negligent Commercial Transaction Tort: Imposing Common Law Liability on Merchants for Sales and Leases to 'Defective' Customers*, 1988 Duke L.J. 755, 758. Although not specifically rejecting the extension of negligent entrustment doctrine to leased real property, it is not difficult to apply the reasoning articulated by a Florida District Court of Appeals to the issues raised by the present case: "The imposition of this new duty not to sell would create uncertainty and retard the free flow of commerce [and the] creation of a duty on the part of the seller to guarantee the acts of a buyer," would effectively require independent investigation to establish each buyer's fitness to use each product, and would be "manifestly unreasonable." *Vic Potamkin Chevrolet, Inc. v. Horne*, 505 So.2d 560, 563 (Fla.Dist.Ct. App.1987). Uncertainty in the law, which by extension creates uncertainty in business transactions and relationships, are such that the cost or potential liability of engaging in such transactions might prove too costly and have a chilling effect on the free flow of commerce. *See Benlehr*, 402 N.E.2d at 1210 (Keefe, J. dissenting) (stating that "[t]he problem of determining when to entrust and when not[,] in specialized types of business[,] seems substantial and unmanageable"). For

example, startup businesses seeking to engage in new ventures that *might* involve properties posing "highly dangerous potentialities" might, for lessors, prove to be too high a risk. The dissent in *Benlehr* points to "other more reasonable means to protect the public, such as licensing laws, [rather] than saddling lessors with an impracticable duty of care in selecting and entrusting." *Id.*

{38} For these reasons, we hold that Gabaldon's negligent entrustment claim is not a recognized cause of action under New Mexico law, and accordingly, Erisa was entitled to summary judgment as a matter of law.

## V.

{39} We affirm the Court of Appeals' holding that the operation of wave pools is not an inherently dangerous activity; however, we reverse the Court of Appeals to the extent that we hold that negligent entrustment of real property by a non-possessory landlord is not a cause of action recognized under New Mexico law.

**IT IS SO ORDERED.**

MINZNER, C.J., FRANCHINI, SERNA, and MAES, JJ., concur.

