This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-40598**

**MARC GRANO, as Personal Representative of the ESTATE OF ROBERTO ANDRADE MAGDALENO; and LAURA CEJA, Individually and as Parent and Guardian of CHRISTIAN ANDRADE CEJA and BRANDON ANDRADE CEJA,**

      Plaintiffs-Appellants,

v.

**RKI EXPLORATION & PRODUCTION, LLC,**

      Defendant-Appellee,

and

**AMERIFLOW ENERGY SERVICES, LLC; CRESCENT SERVICES, LLC; CRESCENT CONSULTING, LLC; RANDY WILLIAMSON; LAMB FLOWBACK SERVICES, LLC; and ROADRUNNER ENVIRONMENTAL, INC.,**

      Defendants.

Harada & Winters LLC
Christopher P. Winters
Nikko Harada
Albuquerque, NM

Tandy Hunt PC
Tandy Hunt
Roswell, NM

Mathis Law Office, LLC
Eugenio S. Mathis
Las Vegas, NM

for Appellants

Holland & Hart LLP
Larry J. Montaño
Olga Serafimova
Santa Fe, NM

Priest & Miller LLP
Ada B. Priest
Albuquerque, NM

for Appellee

**MEMORANDUM OPINION**

**HANISEE, Judge.**

**{1}**     This appeal arises from a wrongful death action related to a 2014 oil and gas well explosion that killed Roberto Andrade Magdaleno. Plaintiffs Marc Grano, as personal representative of the estate of Andrade Magdaleno, and Laura Ceja, individually and as parent and guardian of the heirs of Andrade Magdaleno, filed a wrongful death complaint against RKI Exploration & Production, LLC (RKI)—as well as additional parties with whom Plaintiffs reached settlement agreements—alleging negligence, strict liability, and joint and several liability for a nondelegable duty. Following trial, the jury found that RKI was negligent but that it was not the proximate cause of Magdaleno's death. Plaintiffs argue the district court erred in granting a directed verdict on their claim for strict liability based on an inherently dangerous activity; excluding evidence of a subsequent remedial measure to prove control; excluding the deposition testimony of two expert witnesses; denying their motion for new trial; and allowing a jury instruction on an independent intervening cause. We affirm.

**BACKGROUND**

**{2}**     The fatal event at issue in this appeal occurred when a sand separator, a machine used in a process called "flowback," which is part of the fracking operation, exploded. Use of a sand separator during flowback is typically a job performed by independent contractors who use specialized equipment.

**{3}**     Normally in the fracking process, the oil company pumps thousands of pounds of sand into a well. Flowback specialists then use a sand separator that divides the oil, gas, and water that come out of the well so that oil goes to an oil tank, natural gas goes to a pipeline, and water goes to a water tank. The sand separator can be placed either before or after a choke manifold, which controls the pressure of the fluid coming up from the well bore before it is separated into the different locations. Upon completion of the process, the well is turned over to a production company.

**{4}** In this case, RKI owned and operated a well site called Pecos State 46-4H. RKI hired Maverick Services, LLC (Maverick), an independent contractor, to transport water to and from various well sites. Andrade Magdaleno worked for Maverick as a truck driver in this capacity, including at Pecos State 46-4H.

**{5}** RKI also hired Ameriflow Energy Services, LLC (Ameriflow) as an independent contractor to perform flowback services on the Pecos State 46-4H site. RKI and Ameriflow executed a "Master Services Agreement" (MSA) that covered the work Ameriflow performed for RKI. The sand separator that Ameriflow owned, operated, and used on the Pecos State 46-4H site was manufactured by Roadrunner Environmental, Inc, (Roadrunner). The sand separator was not equipped with a "pop off valve," which is a component of most sand separators that will pop off or open if the machine achieves a specific interior pressure, thereby allowing pressure to escape. Ameriflow never pressure tested the sand separator and did not verify if anyone else had done so. In June 2014, Andrade Magdaleno was at the Pecos State 46-4H site when the sand separator exploded and killed him.

**{6}** Having reached settlement agreements with various defendants including Ameriflow and Roadrunner, Plaintiffs proceeded to trial on their third amended wrongful death complaint against RKI, alleging negligence, strict liability, and joint and several liability for a nondelegable duty. Among other things, Plaintiffs sought punitive damages.

**{7}** Several events before and during trial are at issue in this appeal. First, before trial, RKI moved to exclude nonlive expert testimony, but did not specify to which witnesses its request applied, and the parties fully briefed the issue. The district court granted the motion before trial. Second, the district court limited Plaintiffs' questioning regarding subsequent remedial measures throughout trial. Third, also during trial, Defendants filed a motion for directed verdict arguing that flowback was not an inherently dangerous activity, challenging application of strict, as well as joint and several, liability, which the district court granted. Fourth, at the close of RKI's case, RKI requested an independent intervening cause jury instruction, to which Plaintiffs did not object and which the district court provided to the jury.

**{8}** As stated, the jury found that RKI was negligent but that it was not the proximate cause of Andrade Magdaleno's death. Accordingly, no damages were awarded to Plaintiffs. After trial, Plaintiffs filed a motion for new trial, which the district court denied after full briefing and a hearing. Plaintiffs now appeal.

## DISCUSSION

### I. Inherently Dangerous Activity

**{9}** Plaintiffs argue the district court erred in failing to submit to the jury the issue of strict liability as related to the performance of an inherently dangerous activity, which it contends flowback to be. We review this issue de novo. *See Gabaldon v. Erisa Mortg. Co.*, 1999-NMSC-039, ¶ 7, 128 N.M. 84, 990 P.2d 197.

**{10}** Generally, "an employer of an independent contractor is not responsible for the negligence of the contractor or [their] employees." *Saiz v. Belen Sch. Dist.*, 1992-NMSC-018, ¶ 10, 113 N.M. 387, 827 P.2d 102. However, our Supreme Court created an exception to this rule when it determined that engaging in "inherently dangerous" work establishes "a nondelegable duty of care that could only be effectively enforced through imposition of joint and several liability." *Estate of Saenz v. Ranack Constructors, Inc.*, 2015-NMCA-113, ¶ 16, 362 P.3d 134 (internal quotation marks and citation omitted), *rev'd on other grounds*, 2018-NMSC-032, ¶ 42. To determine if an activity is inherently dangerous, we must assess a three-pronged test adopted in *Gabaldon*. The test requires the following combination of specific facts:

> 1) the activity must involve an unusual or peculiar risk of harm that is not a normal routine matter of customary human activity; 2) the activity is likely to cause a high probability of harm in the absence of reasonable precautions; and 3) the danger or probability of harm must flow from the activity itself when carried out in its ordinary, expected way, such that reasonable precautions aimed at lessening the risk can be expected to have an effect.

*Gabaldon*, 1999-NMSC-039, ¶ 13. Our analysis hinges on the third requirement of the test.

**{11}** "The third prong requires analysis of the source of the harm." *Id.* ¶ 19. It "asks whether the risk of harm flows from the activity itself when carried out in an ordinary expected manner or whether the harm results from the negligence of a particular actor." *Valdez v. Yates Petroleum Corp.*, 2007-NMCA-038, ¶ 8 141 N.M. 381, 155 P.3d 786 (alterations, internal quotation marks, and citation omitted). The "damages caused by an actor's negligence in the operative details of the activity—such as failure to conduct routine maintenance on machinery used in conducting the activity—will not by themselves trigger liability, whether vicarious or direct." *Gabaldon*, 1999-NMSC-039, ¶ 19 (alteration, internal quotation marks, and citation omitted).

**{12}** As we noted above, flowback is a process wherein specialized independent contractors pump sand into a wellhead to push oil, natural gas, and water out of the well. Plaintiffs' argument regarding this prong is limited to addressing the inherent risks of working in an oilfield based on unexpected pressure fluctuations. RKI contends that the risk of harm from the explosion in this case did not flow from the activity itself, but from the negligence of an actor because when a sand separator is defective by not having a pop off valve—as was here the case—the flowback process is not taking place in its normal manner. RKI points to the fact that none of the witnesses testified to having ever experienced other flowback related incidents.

**{13}** We agree with RKI. The danger at issue in this case is based on a pressurized explosion. The explosion occurred because there was no pop off valve in the sand separator to warn the independent contractor user about excess pressure build-up during the process of flowback. The explosion thus occurred due to a manufacturing

defect, because a typical sand separator would include a pop off valve. Using a "reasonable precaution aimed at lessening the risk [of harm]"—here the absent pop off valve—would have reduced the dangerousness of the activity to its normal level. *See id.* ¶ 13. Thus, the risk of harm in the flowback process arose from the negligence of creating a machine without a pop off valve, as opposed to danger associated directly with the activity undertaken—here flowback as effectuated during the process of fracking—carried out in its normal manner. *See Valdez*, 2007-NMCA-038, ¶ 8 Accordingly, we agree with the district court's determination that RKI is not strictly or jointly and severally liable for the negligence of its contractor based upon the inherently dangerous nature of flowback itself.

## II. Evidence of Subsequent Remedial Measures

{14}    Plaintiffs argue the district court erred in excluding evidence of subsequent remedial measures by RKI that could have demonstrated contested issues such as ownership, control, and the feasibility of precautionary measures. "We review the admission of evidence for an abuse of discretion." *Benz v. Town Ctr. Land, LLC*, 2013-NMCA-111, ¶ 11, 314 P.3d 688 (internal quotation marks and citation omitted). "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Id.* (internal quotation marks and citation omitted).

{15}    Under Rule 11-407 NMRA,

> [w]hen measures are taken by a defendant that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove the following: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction.

> But the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures.

{16}    Before trial, the parties filed motions in limine regarding subsequent remedial measures. At the pretrial conference, Plaintiffs agreed to alert the court before offering or introducing evidence of subsequent remedial measures. Plaintiffs made multiple such requests during trial.

{17}    In the first instance, Brett Umberham, RKI's drilling and completions manager at the time of the explosion, testified about RKI's oversight of the flowback process. Umberham repeatedly stated that it was Ameriflow's job to *supervise* the flowback process, to *rig up* the equipment, and to *oversee* the process. After several questions from Plaintiffs, Umberham agreed that he never asked his RKI foreman to *observe* the rig of the flowback nor to *oversee* the process. In a bench conference immediately after this testimony, Plaintiffs requested to impeach Umberham with evidence that RKI made

the decision to oversee the rig for flowback after the explosion. The district court denied the request, in effect determining there to remain an absence of control on the part of RKI given its employees did not supervise operation of or inspect the flowback equipment and, as such, testimony that RKI changed the nature of its presence during flowback amounted to an inadmissible subsequent remedial measure.

{18}     The issue arose next following an exchange between Plaintiffs and Umberham regarding the MSA between RKI and Ameriflow. Plaintiffs asked Umberham if he had previously testified that under the MSA, RKI had no right to control the work of Ameriflow, to which Umberham reiterated was the case under the MSA. Plaintiffs argued, again during a bench conference, that a subsequent remedial measure is admissible to prove control and the testimony they would like to introduce was that after the accident RKI changed their policy, directed the flowback operators in the sequencing of the equipment, moved the placement sequence of the separator and the manifold, and directed their own completions consultant and their productions foreman to be present during flowback. Plaintiffs requested to present evidence that RKI reordered the sequencing of the equipment to prove that they did have the right of control of operations. The district court, however, adhered to its conclusion that minimal process changes developed by RKI following the accident were subsequent remedial measures and did not permit the testimony.

{19}     The third such exchange occurred during the testimony of RKI's expert witness Andrew Stringer, who discussed dangers associated with an oil and gas company instructing multiple subcontractors during a fracking operation. Stringer testified that the flowback operator is the best person to oversee flowback, as RKI has neither the equipment nor the trained personnel necessary to facilitate or oversee the process. He added that flowback specialists trained their personnel, and to control such a process RKI would either have to retain someone to train their own employees on flowback protocol or develop a training program to do so, which would be economically impractical. Over Plaintiffs' objections, the district court framed the issue in terms of whether RKI personnel instructed the independent contractors in the *performance* of their duties, despite evidence that RKI instructed the flowback operators on the sequence of the flowback operation, which they had not done before the accident. Given evidence suggested that RKI told Ameriflow to differ the sequencing, however, the district court opted to permit questions to Stringer as impeachment evidence.

{20}     The next morning, the parties once more addressed the scope of Plaintiffs' questioning in this regard. RKI expressed concern that the jury lacked context regarding the configuration of the wellhead, separator, and manifold, and that bringing this new topic into evidence would cause confusion. RKI proposed not addressing when RKI sought a change in sequencing. The court agreed, to which Plaintiffs' attorney responded, "I don't think the time's that important to me." In any event, the district court was clear that Plaintiffs could question Stringer about the topic of changes to sequencing. Plaintiffs then asked if they could also cross-examine Stringer on his comment that it would not be economically feasible for RKI to train their consultants on flowback, which the district court also permitted.

**{21}** Ultimately, Plaintiffs asked Stringer if it was his testimony that RKI had no right to control Ameriflow, and Stringer agreed. Plaintiffs reiterated multiple times that Stringer said it was wrong and dangerous for RKI to tell Ameriflow how to do the particulars of the job before confronting Stringer with the fact that RKI told Ameriflow how to change the sequencing of the equipment. Stringer disagreed that such would establish control, but that it was preference of placement of equipment, and stated it was not an instruction. Plaintiffs then presented Stringer with deposition testimony from an Ameriflow employee who stated, "As of about five days ago, I was told at a meeting that we would start rigging up the manifold before the sand separator." Such testimony served to alert the jury that the sequencing modification was indeed a recent change, after which the district court told Plaintiffs to move on, which ended the line of questioning.

**{22}** Rule 11-407 prohibits the admission of evidence of subsequent remedial measures, and the district court excluded most of the evidence on this basis. Plaintiffs' argument to this Court seems to be that control of the flowback process was demonstrated when RKI directed flowback operators in the sequencing of the equipment used and by having their own completions consultant and their productions foreman present for the rig up. We address each contention accordingly.

**{23}** First, the record demonstrates that Plaintiffs were indeed able to present evidence that RKI ordered the flowback contractors to change the sequencing of their equipment to place the manifold ahead of the separator. Plaintiffs argue that despite the testimony from Stringer, they were prejudiced because fact witnesses were unable to testify about the issue. They contend that if the facts and circumstances of the case rendered admissible expert testimony about the matter, then so was direct evidence of the sequencing change from fact witnesses. *See Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153 ("An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case."). Here, however, it was Stringer's testimony, capably cross-examined including by use of deposition testimony regarding the sequencing change—including the post-accident timing thereof, which the parties had agreed not to present—that informed the judge that Plaintiffs should be able to present the occurrence of the sequencing change to the jury. Our review of the exchange reveals that which Plaintiffs wished to present to the jury was presented. Given that, we cannot conclude the district court to have abused its discretion in handling the evidentiary issue as it did. *See id.*

**{24}** Plaintiffs also argue that the district court erred by failing to permit testimony regarding RKI having directed their foremen to be present for the rig up. The district court's explanation was generally that having an RKI employee at the site did not amount to control because RKI did not have the expertise to control flowback operations and that Plaintiffs were obfuscating the issue by using words such as "monitor, supervise, and inspect" interchangeably. It was logical to determine that having an RKI employee on site—and present for the initiation and performance of flowback procedure as directly performed by Ameriflow employees—did not amount to control of the flowback process. Thus, the district court did not abuse its discretion. *See id.*

### III.    Exclusion of Deposition Testimony of Expert Witnesses

**{25}**    Before trial, RKI filed a motion in limine to exclude nonlive testimony by expert witnesses, which Plaintiffs opposed. At the time, neither party specified which witnesses were expected to testify. The district court took up the issue before trial.

**{26}**    During this argument, Plaintiffs explained that Charles Stone was a petroleum engineer hired by other parties as expert witnesses in the case, and they also spoke about the deposition testimony of expert Randy McClay. At the time, Plaintiffs had their own expert who was expected to testify. The three engineers—Plaintiffs' own and those of the former defendants in the case—were going to conclude that RKI was primarily responsible for the explosion. Plaintiffs explained, however, that Stone and McClay used different methodologies than their expert to reach that same conclusion. Their depositions had been taken before trial and all parties were given an opportunity to cross-examine the witnesses.

**{27}**    Ultimately, the district court did not admit the deposition testimony. It reasoned that Rule 1-032(A)(3)(b) NMRA—which provides that a deposition of a witness may be used by a party if that witness is greater than 100 miles from the place of trial or is out of state unless the absence of the witness was procured by the party offering the deposition—was intended to apply to fact witnesses who were subpoenaed. It also relied on Rule 11-702 NMRA and the district court's gatekeeping function related to qualifying expert witnesses. It noted there would be no opportunity in front of the jury to explore any bias, mode of prejudice and anything else that could bear on the additional experts' credibility. It also concluded that it was cumulative and unfairly prejudicial.

**{28}**    Plaintiffs argue that the district court erred because Rule 1-032 is not limited to fact witnesses and thus can apply to expert witnesses; the district court could fulfill its gatekeeping function pursuant to Rule 11-702 because it could determine the qualifications based on the deposition testimony; Rule 1-032 does not differentiate between trial and discovery depositions; the district court failed to perform a Rule 11-403 NMRA balancing test when assessing the cumulative nature of the testimony; the testimony was not needlessly cumulative because it would have only taken forty-two minutes and would have corroborated the testimony of Plaintiffs' expert witness; it should have permitted questioning on McClay and Stone's testimony to other witnesses pursuant to Rule 11-703 NMRA; and it did not perform a Rule 11-403 balancing test or explain why it was unduly prejudicial.

**{29}**    A district court's decision to admit or exclude evidence, such as the deposition testimony at issue here, is reviewed for an abuse of discretion. *Hourigan v. Cassidy*, 2001-NMCA-085, ¶ 21, 131 N.M. 141, 33 P.3d 891. In addition to establishing error through abuse of discretion, "the complaining party on appeal must show the erroneous admission and exclusion of evidence was prejudicial in order to obtain a reversal." *Id.* (internal quotation marks and citation omitted).

**{30}** Plaintiffs have failed to demonstrate they were prejudiced by the exclusion of the evidence. Here, the deposition testimony merely amounted to supplemental conclusions from two expert witnesses that was effectively the same as testimony expected from Plaintiffs' expert. That the proposed experts' conclusions relied on different methodologies is not sufficient to demonstrate prejudice. Indeed, Plaintiffs succeeded in admitting the evidence at issue—expert testimony that RKI's conduct was below the industry standards—and we cannot now conclude that the district court's decision to limit other methods of introducing such testimony was an abuse of discretion.

## IV.    The Denial of Plaintiffs' Motion for a New Trial

**{31}** Plaintiffs argue the district court erred in denying their motion for a new trial. We review the denial of a motion for new trial for an abuse of discretion. *Saenz*, 2015-NMCA-113, ¶ 55.

**{32}** Plaintiffs' argument is that the district court abused its discretion in failing to grant a motion for new trial based on the preceding issues in this opinion—whether the district court erred in determining flowback does not amount to an inherently dangerous activity, failing to permit testimony regarding subsequent remedial measures, and excluding the deposition testimony of the additional expert witnesses. As we have determined that the district court did not err regarding any of those issues, we cannot say the district court abused its discretion in denying the motion for new trial.

## V.    Jury Instruction on an Independent Intervening Cause

**{33}** Plaintiffs' final argument—presented for the first time in its motion to reconsider—is that the district court erred in allowing the jury to be instructed on an independent intervening cause. RKI answers Plaintiffs did not preserve the issue.

**{34}** To preserve an issue for review on appeal, "a party must have made a timely and specific objection that apprised the district court of the nature of the claimed error and that allows the district court to make an intelligent ruling thereon." *Gonzales v. Shaw*, 2018-NMCA-059, ¶ 14, 428 P.3d 280 (internal quotation marks and citation omitted); *see Hinger v. Parker & Parsley Petroleum Co.*, 1995-NMCA-069, ¶ 32, 120 N.M. 430, 902 P.2d 1033 ("No New Mexico civil case has permitted a litigant to fashion legal objections to jury instructions for the first time on appeal."). To preserve an error regarding jury instructions, "it is necessary to object or tender a correct jury instruction." *Ulibarri v. Jesionowski*, 2023-NMCA-008, ¶ 61, 523 P.3d 624.

**{35}** Plaintiffs argue that RKI did not timely provide the jury instructions when it provided its proposed instructions at 10:00 p.m. the night before the hearing on the jury instructions and that the district court "unilaterally decided to accept RKI's jury instruction on independent intervening cause." But that is not the issue, because the record demonstrates that Plaintiffs failed to object to the jury instruction on an independent intervening cause when they were given an opportunity during the hearing. A lack of objection when the matter of jury instructions is discussed—whether that is at

a time preferred by Plaintiffs or some other time as handled in the process of trial by the district court—is fatal to a claim of instructional error. As the issue was therefore not properly preserved, we will not address it.

**CONCLUSION**

**{36}**   We affirm.

**{37}   IT IS SO ORDERED.**

**J. MILES HANISEE, Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**SHAMMARA H. HENDERSON, Judge**