**Certiorari Granted, October 23, 2015, No. 35,515**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2015-NMCA-113**

**Filing Date:  August 18, 2015**

**Docket No. 32,373**

**ESTATE OF CHARLES ANTHONY SAENZ, by
and through his personal representative, VIRGINIA
SAENZ, individually and as Next Friend of ROBIN
BRANDY SAENZ, minor child, MARCUS ANTHONY
SAENZ, and JASON RAY SAENZ,**

    **Plaintiffs-Appellants,**

**v.**

**RANACK CONSTRUCTORS, INC.,**

    **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY
Manuel I. Arrieta, District Judge**

Law Office of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

Cervantes Law Firm, PC
Joseph Cervantes
Las Cruces, NM

Scherr & Legate PLLC
Maxey M. Scherr
El Paso, TX

for Appellants

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Jocelyn Drennan

1

Albuquerque, NM

for Appellee

## OPINION

**BUSTAMANTE, Judge.**

**{1}**     Defendant Ranack Constructors, Inc., a general contractor, was hired to build a multi-screen movie theater. Ranack hired Alamo General Contractors, Inc. as a subcontractor to build the steel framework of the theater. Decedent Charles Saenz was an ironworker employed by Alamo and its related entity T&T Staff Management (T&T), a staffing agency. Saenz was working on the theater project at a height in excess of twenty-five feet, without fall protection, when he fell and died. This appeal follows a jury trial.

**{2}**     The case raises two issues.  First, whether the concept of joint and several liability in *Saiz v. Belen School District*,  1992-NMSC-018, ¶¶ 18-21, 113 N.M. 387, 827 P.2d 102 should be applied in favor of employees of subcontractors.  And, second, whether a new trial on wrongful death damages for Saenz's estate is appropriate.  We conclude that *Saiz* is not applicable to claims made by employees of subcontractors.  We also conclude that a new trial addressing the estate's damages only should be held.  We thus affirm in part and reverse in part.

## BACKGROUND

**{3}**     Saenz fell as the Alamo crew was attempting to set a roof joist on the building. Saenz's job was to receive one end of the joist as it was suspended by a crane and put it in place.  The joist was supposed to be placed on an intersecting beam. Saenz could have accomplished this task by using a ladder to get on top of the beam that he needed to reach and employing his fall-protection equipment. Instead, Saenz approached the placement point by walking on the top edge of a concrete and Styrofoam wall that was part of the unfinished structure and that was more than twenty-five feet above the concrete floor. By one witness account, Saenz slipped as he reached for the joist tag lines, and by another witness account, the roof joist struck the wall and caused him to lose his balance.  Whatever the cause of his loss of balance, Saenz fell to the concrete below and died from the impact.

**{4}**     In terms of personal fall-protection equipment, evidence at trial showed that Saenz was wearing a harness equipped with a lanyard.  In addition, a beamer—a device that clamps to a beam and provides an anchor point for the lanyard—was on the beam where the joist was to be placed. When a worker has hooked his fall-protection equipment to a secure point he is "tied off." Saenz was required to be tied off when he was performing the task that led to his fall. Saenz was not tied off when he fell.

**{5}**     Testimony at trial also demonstrated that Ranack failed in a number of respects to

2

ensure the safety of the job site. Summarized, those failures included, among other things: a failure to provide and enforce an adequate fall-protection safety plan; a failure to ensure that subcontractors were adequately and safely performing their work; a failure to ensure that workers were, in fact, protected from fall hazards; a failure to staff the job with full-time safety personnel; and an emphasis on hurrying to get the job done that caused subcontractors and workers to take shortcuts, including shortcutting safety.

**{6}** Plaintiff Virginia Saenz, individually and as personal representative of her husband's estate and as next friend of Saenz's children, Robin, Marcus, and Jason, filed a wrongful death lawsuit against Ranack. Because Alamo and T&T were Saenz's employers, workers' compensation provided the exclusive remedy against them. As such, they were not named in the complaint, but were identified together as a single potential tortfeasor in the jury instructions. The original complaint specifically asserted premises liability and simple negligence causes of action against Ranack. The complaint contains no mention of *Saiz*-type liability based on its concepts of peculiar risk or inherent danger. *Id.* ¶¶ 18-21.

**{7}** After a ten-day trial, the case was submitted to the jury on ordinary care, negligence, and premises liability theories. The "theory of the case" instruction detailed the ways each party thought the other was negligent. The list in the instruction echoed and expanded upon the summary provided above in Paragraph 5. The special interrogatory instruction submitted did not ask the jury to specify which asserted theories it credited. Given its verdict, it is obvious that the jury found a degree of fault in all of the actors' acts or failures to act.

**{8}** Pursuant to a comparative fault instruction, the jury found Ranack forty-five percent at fault, Alamo and T&T thirty percent at fault, and Saenz twenty-five percent at fault for his death. The district court entered a judgment ordering Ranack to pay forty-five percent of the wrongful death judgment in addition to jury-awarded punitive damages.

**{9}** Ranack has not appealed, nor does it otherwise contest, the district court's legal determination that it owed Saenz a duty of ordinary care. Interestingly, Ranack requested that UJI 13-401 NMRA—defining independent contractors and limiting the liability of employers for the wrongful acts of the independent contractors' employees—be given to the jury, but then withdrew the request. Ranack also does not refute the propriety of the jury's attribution to it for forty-five percent of the fault for Saenz's death.

**{10}** The jury found the total amount of damages suffered by Plaintiff Virginia Saenz, individually, to be $482,000. Additionally, the jury found Robin's damages to be $50,000, and Marcus and Jason to each have suffered $25,000 in damages. Saenz's wife and children were also awarded $10,000 each in punitive damages. As to Saenz's estate, however, the jury awarded zero damages.

**{11}** In a post-trial motion, Plaintiff requested a mistrial on the basis of the zero damages award to the estate. At the hearing on the motion, Plaintiff argued that the jury's decision to award zero damages to Saenz's estate was the result of jury confusion and, alternatively, that

it was not supported by substantial evidence. The district court denied Plaintiff's motion. The court concluded that based on the facts at trial, in particular, Saenz's criminal history and his prior incarceration, the jury could reasonably have found that the zero value was appropriate.

**{12}** With regard to whether the jury was confused by the instructions as to the damages it should award to Saenz's estate, the district court apparently decided that Plaintiff waived any objection on that ground because Plaintiff's counsel agreed to the district court's proposed response to a jury question regarding estate damages. During its deliberations, the jury sent the following question to the district court: "Does 'total amount of damages to the Estate of Charles Saenz' include all amounts awarded to Virginia, Rob[in], and sons[,] or is it meant to be a separate amount?" After conferring with counsel, the district court suggested that it respond by saying that "[t]he 'total amount of damages to the Estate of Charles Saenz' is separate." All counsel agreed with that suggestion.

**{13}** As an alternative to a mistrial, Plaintiff requested in her post-trial motion that the district court enter a judgment notwithstanding the verdict on the ground that Saenz was engaged in inherently dangerous work and that, as a result, "Ranack should be held strictly liable for the damages herein[.]" At the hearing, Plaintiff's counsel argued that there should be no reduction for comparative negligence. Standing by an earlier ruling on this issue, the district court declined to hold that Saenz was engaged in inherently dangerous work at the time of his death.

**{14}** On appeal, Plaintiff continues to argue that Saenz was engaged in an inherently dangerous activity and that, accordingly, Ranack should be held jointly and severally liable for his death. Plaintiff also contends that reversal and remand for a new trial is required because jury confusion arising from conflicting instructions as to loss of consortium may have led the jury to mistakenly award to Plaintiff and to Saenz's children damages that should have been awarded to the estate. Alternatively, Plaintiff argues that the zero damages award to the estate was not supported by substantial evidence.

**DISCUSSION**

**The Joint and Several Liability Issue**

**{15}** Plaintiff argues that Ranack should be held jointly and severally liable for all damages found by the jury. Plaintiff recognizes that joint and several liability is not generally available in New Mexico. This Court abolished joint and several liability in toto in *Bartlett v. New Mexico Welding Supply, Inc.*, 1982-NMCA-048, ¶¶ 33-37, 98 N.M. 152, 646 P.2d 579, *superseded by statute as stated in Payne v. Hall*, 2006-NMSC-029, 139 N.M. 659, 137 P.3d 599. The holding in *Bartlett* was seen as a logical imperative flowing from our Supreme Court's adoption of pure comparative negligence in *Scott v. Rizzo*, 1981-NMSC-021, ¶ 30, 96 N.M. 682, 634 P.2d 1234 (adopting in full the Court of Appeals opinion in the same consolidated cases), *superseded in part by statute as stated in Rodriguez v. Williams*,

4

___-NMCA-___, ___ P.3d ___, 2015 WL 1412633 (Nos. 33,138 and 33,668) (Mar. 26, 2015). Six years later, the Legislature addressed the subject. *See* NMSA 1978, § 41-3A-1 (1987). Echoing *Bartlett*, the Legislature also abolished joint and several liability in cases involving comparative fault. Unlike *Bartlett*, however, the Legislature provided four exceptions to the general rule of abolition. Section 41-3A-1(C). Only one of the four exceptions is directly relevant here. Section 41-3A-1(C)(4) provides that joint and several liability shall apply "to situations . . . having a sound basis in public policy."

**{16}** Our Supreme Court relied on Section 41-3A-1(C)(4) to impose joint and several liability in cases involving work or endeavors which are "inherently dangerous" or carry "peculiar risks." *Saiz*, 1992-NMSC-018, ¶¶ 15-19 (relying on Sections 413, 416, and 427 of the Restatement (Second) of Torts (1965)). The Supreme Court held that engaging in such work created a nondelegable duty of care that could only be effectively enforced through imposition of joint and several liability. *Saiz*, 1992-NMSC-018, ¶¶ 35-36.

**{17}** Plaintiff also recognizes that *Saiz* by itself does not provide a basis for imposing joint and several liability in this case. In an earlier opinion involving a factual scenario much closer to this case, the Supreme Court held specifically that Sections 413, 416, and 427 of the Restatement (Second) of Torts should not be applied in favor of employees of independent contractors. *N.M. Elec. Serv. Co. v. Montanez*, 1976-NMSC-028, ¶¶ 14-15, 89 N.M. 278, 551 P.2d 634. There are material factual dissimilarities between *Saiz* and this case. We will detail the factual distinctions in a later section of this Opinion. Nevertheless Plaintiff argues that developments in New Mexico case law—including *Saiz* and this Court's opinion in *Enriquez v. Cochran*, 1998-NMCA-157, 126 N.M. 196, 967 P.2d 1136—support a conclusion that *Montanez* should not control the outcome here. To the contrary, as we will explain, we conclude that *Montanez* is still good law and is in keeping with the vast majority of cases across the nation addressing the issue.

**{18}** Our discussion will start with a detailed review of the district court's consideration of Plaintiff's request to impose *Saiz*-based liability on Ranack. We will then analyze *Saiz* and *Enriquez*. Finally, we will review the case law across the country and the Restatement Second and Third of Torts. Because we conclude that *Saiz*-based joint and several liability is not applicable to the employees of subcontractors on construction sites, we need not, and will not, consider whether Saenz was engaged in inherently dangerous work.

## A.     The District Court Decision

**{19}** As we noted above, Plaintiff did not include a claim for nondelegable duty and joint and several liability in her complaint. *Saiz* and its progeny were first mentioned during argument on the parties' pretrial motions in limine about a week before trial commenced. The first matter argued was Ranack's motion to exclude testimony concerning delays on the project assertedly caused by improper steel design and foundation work. Ranack couched its argument as a question of duty, asserting that it had no duty of care to its subcontractor's employees and thus evidence as to delays in construction was irrelevant. In partial response

5

to Ranack's argument, Plaintiff argued that Ranack could be found to have a duty under *Saiz* and *Enriquez*. *Enriquez*, 1998-NMCA-157, ¶ 98 (holding that felling of large trees was inherently dangerous). The district court eventually denied Ranack's motion, noting specifically that it had not "looked at the issue of inherently dangerous" and holding the issue for a later time.

**{20}** A week later at the beginning of the trial, the parties discussed whether the idea of "peculiar risk of danger" should be included in the pre-voir dire description of the case to the jury. Ranack objected to its inclusion and the district court agreed, noting that it was still thinking about the issue.

**{21}** The parties and the district court took the matter up in earnest as they started work on the jury instructions. Referring to an apparently off-the-record discussion from the previous day, the district court asked to reopen the issue in order "to reconsider its ruling yesterday on inherently dangerous condition or peculiar risk." The district court articulated a number of reasons why it had decided not to impose *Saiz*-based strict liability even though "both experts and a number of individuals [had testified] that this is inherently dangerous work." The district court's rationale was that to impose strict liability would (1) "ignore the contractual relationship between [the] parties[;]" (2) "nullify all those OSHA standards and directives about controlling contractors," and (3) make every general contractor and every landowner "strictly liable for any fall of any person from any building during construction." In addition, the district court noted that prior cases finding inherent danger involved injured third parties rather than individuals who were directly involved in the dangerous activity and who may have contributed to their own injury. The district court decided to "submit this case to the jury on the basis of negligence and premises liability."

**{22}** Later that same day the matter was argued again, allowing Ranack to be heard more fully. Ranack started its argument by citing *Montanez* and its holding that general contractors do not owe a duty of care to the employees of its independent contractors under Sections 413, 416, and 427 of the Restatement (Second) of Torts. Ranack did not argue that the work Saenz was engaged in was not inherently dangerous. Its arguments revolved around the type of duty Ranack owed as a general contractor to employees of its subcontractors.

**{23}** In the end, the district court adhered to its prior ruling that it would not deem the "steel erection being done in this case" to be an inherently dangerous activity. When prompted by Plaintiff's counsel, the district court confirmed that its decision was based on the policy implications it had articulated earlier.

**{24}** The next day the district court held a more formal proceeding in which the parties made their record with regard to specific jury instructions. Plaintiff had requested that UJI 13-1634 NMRA—describing strict liability for nondelegable duties—be given to the jury. The district court formally refused the instruction, restating its prior rationale. The district court expanded its prior rulings by noting that it did "not feel that a contractor/landowner should be strictly liable for any steel erection on the premises when the majority of the

6

control for the safety precautions is within the independent contractor's authority and within the control of the injured individual."

**{25}** The district court's rationale was internally consistent, reflecting appropriate policy concerns for the potentially far-reaching and largely unknown impact of imposing *Saiz*-based strict liability on landowners and general contractors engaged in construction projects. But the district court never conducted the analysis set out by our Supreme Court in *Gabaldon v. Erisa Mortgage Co.*, 1999-NMSC-039, 128 N.M. 84, 990 P2d 197, to determine whether steel erection on relatively large projects is inherently dangerous. Neither did it squarely decide whether—as argued by Plaintiff—the Supreme Court's clear holding in *Montanez* had been overtaken by its opinion in *Saiz* and our opinion in *Enriquez*. We certainly do not fault the district court for not undertaking these analyses. Counsel's arguments were not well-focused, coming as they did at the end of a long trial. It is left to us with the luxury of time to more directly deal with the legal issues raised by this factual scenario.

**B.  Nondelegable Duty Does Not Apply to Employees of Subcontractors**

**1.  The *Montanez* Opinion**

**{26}** As the parties recognize, *Montanez* stands as a substantial impediment to the application of *Saiz*-based joint and several liability to general contractors such as Ranack. The plaintiff worker in *Montanez* was injured when he came into contact with a live wire in the process of dismantling a secondary power line feeding an oil well. 1976-NMSC-028, ¶ 3. The plaintiff worked for the independent contractor hired to take down the secondary lines. The named defendants were Wolfson Oil Company, Cass-Fitts Electric Company, and the New Mexico Electric Service Company. Wolfson owned the oil well and hired Gary Electric, the plaintiff's employer, to dismantle the secondary system. Cass-Fitts built the secondary system originally for Wolfson. The utility supplied power through its primary system which occupied the same poles as the secondary system. *Id.* ¶¶ 6-7.

**{27}** The district court entered summary judgment in favor of all the defendants, though it is not clear on what ground. Each of the defendants argued that they had no duty toward the plaintiff, and that he was in any event contributorily negligent as a matter of law. *See Montanez v. Cass (Cass)*, 1975-NMCA-142, ¶¶ 3, 5, 89 N.M. 32, 546 P.2d 1189, *aff'd in part and rev'd in part by Montanez*, 1976-NMSC-028. The plaintiff appealed.

**{28}** We will examine the Court of Appeals opinion in some detail because it provides an elucidative backdrop to the Supreme Court's holding. The Court of Appeals reversed as to all the defendants finding that each of them owed a duty of ordinary care toward the plaintiff. *Cass*, 1975-NMCA-142, ¶ 28. Of particular relevance to us is its discussion of Wolfson's duty. Wolfson hired the plaintiff's employer to take down the secondary system. Wolfson argued that it had no duty to the plaintiff because he was an employee of independent contractors—Cass-Fitts and Gary Electric, the plaintiff's employer. *Id.* ¶¶ 29-30. The Court of Appeals recognized, "[t]he traditional rule is that the employer of an independent

7

contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." *Id.* ¶ 31. The Court of Appeals also recognized that "[a]n exception to this traditional rule arises when the independent contractor is engaged in the performance of inherently dangerous work." *Id.* In that circumstance, the employer is liable to third persons for physical harm caused by its independent contractor. *Id.* (citing Prosser, *Law of Torts*, at 472 (4th ed. 1971)).

{29} The Court of Appeals then embarked on what can be reasonably described as an impassioned statement as to why [p]ublic policy demands that third persons . . . be [so] protected and why the concept of third persons should include the employees of subcontractors. *Cass*, 1975-NMCA-142, ¶¶ 33-36 (internal quotation marks omitted). The Court of Appeals noted that New Mexico had already included employees of subcontractors as protected third persons—or "others" in the parlance of the Restatement (Second) of Torts—when it adopted Restatement (First) of Torts § 414 (1934) in *DeArman v. Popps*, 1965-NMSC-026, ¶ 21, 75 N.M. 39, 400 P.2d 215. *Cass*, 1975-NMCA-142, ¶¶ 39-41. The Court of Appeals then explicitly held that the same rationale and rule applied to the duty described in Sections 416 and 427 of the Restatement (Second) of Torts. That is, the term "others" in these two sections included employees of independent contractors within its ambit. *Cass*, 1975-NMCA-142, ¶¶ 42-46.

{30} The Court of Appeals recognized that there was authority to the contrary and that the Restatement (Second) itself included indications that employees of independent contractors should not receive the benefit of Sections 416 and 427 protection. *Cass*, 1975-NMCA-142, ¶¶ 48-49. The Court of Appeals opinion brushed those concerns aside and held that based on the Restatement, public policy, and the "long sustenance of the rule," employees of independent contractors were owed a duty of due care when the work being performed was inherently dangerous. *Id.* ¶ 54.

{31} The Court of Appeals opinion in *Cass* mirrors substantively the opinion Plaintiff would have us issue in this case. The difficulty for Plaintiff is that our Supreme Court specifically disagreed with and disapproved of the Court of Appeals' holding and rationale. *Montanez*, 1976-NMSC-028, ¶¶ 15-16. The Supreme Court specifically held that the employees of independent contractors were not within the class of persons protected by Sections 413, 416, and 427 of the Restatement (Second) of Torts. The Court explicitly approved the underlying rationale of other cases so holding, in particular cases that the Court of Appeals had cited with disapproval.[1] *Montanez*, 1976-NMSC-028, ¶ 15; *see Welker v. Kennecott Copper Co.*, 403 P.2d 330 (Ariz. Ct. App. 1965), *rejected on other grounds by*

---

[1]On the other hand, the Court reaffirmed liability under Section 414 of the Restatement (First) of Torts (1934), when an owner or general contractor retains some control over the work being done. *Montanez*, 1976-NMSC-028, ¶ 17. This type of duty continues to be recognized in New Mexico. *Hinger v. Parker & Parsley Petroleum Co.*, 1995-NMCA-069, ¶ 36, 120 N.M. 430, 902 P.2d 1033.

8

*Lewis v. N.J. Riebe Enters., Inc.*, 825 P.2d 5 (Ariz. 1992); *King v. Shelby Rural Elec. Coop. Corp.*, 502 S.W.2d 659 (Ky. Ct. App. 1973). *Contra Cass*, 1975-NMCA-142, ¶ 49.

### 2.      *Saiz* and *Enriquez* Do Not Undermine *Montanez*

**{32}**     Plaintiff's response is that developments in New Mexico law have superseded the Supreme Court's reasoning in *Montanez*. We disagree.

**{33}**     Plaintiff relies on *Saiz* and *Enriquez* for her position. *Saiz*, of course, was the case in which New Mexico adopted Sections 413, 416, and 427 of the Restatement (Second) of Torts and their concepts of peculiar risk and inherent danger. The facts in *Saiz* are so different from *Montanez*, however, that *Saiz* says little if anything about whether the Supreme Court would decide *Montanez* differently now. *Saiz* involved a classic "innocent bystander." A high school student attending a football game simultaneously touched a metal electric conduit running up a wooden light pole and a nearby metal fence. He was electrocuted because the contractor who installed the electrical service used the wrong kind of bushing where the buried electrical service line met the metal conduit. *Saiz*, 1992-NMSC-018, ¶¶ 3-4, 29. Given these facts, the Supreme Court had no reason to consider the effect, if any, its decision would have on the holding of *Montanez*. In our position as an intermediate appellate court we are loath to speculate whether the Court would now modify or reverse *Montanez*. *State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶ 21, 135 N.M. 375, 89 P.3d 47 (stating that Supreme Court "decisions remain binding precedent until [the Supreme Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality" (internal quotation marks and citation omitted)); *Behrens v. Gateway Court, LLC*, 2013-NMCA-097, ¶ 16, 311 P.3d 822 (stating that the Court of Appeals is bound by Supreme Court precedent); *Dunning v. Buending*, 2011-NMCA-010, ¶ 11, 149 N.M. 260, 247 P.3d 1145 (stating that the Court of Appeals is bound by Supreme Court precedent even when aspects of that precedent have been rejected by other authorities).

**{34}**     Similarly, *Enriquez* provides little or no guidance as to how the Supreme Court would decide the *Montanez* issues today. First, *Enriquez* is an opinion of this Court and cannot be deemed to have reversed or modified Supreme Court case law which is otherwise in good standing. More to the point, however, the facts in *Enriquez* again are materially different from the facts in *Montanez*.

**{35}**     In *Enriquez*, an employee of a local Boy Scouts council was badly injured when a large tree he was helping to cut down broke and fell in an unexpected direction. 1998-NMCA-157, ¶¶ 12-17. He sued the Boy Scouts of America asserting that it should have provided more training and supervision of the tree cutting process in its position as the chartering organization for the local council. *Id.* ¶ 51. The relationship between the plaintiff in *Enriquez* and the Boy Scouts of America was not that of a general contractor or owner and an independent contractor and its employees. *Enriquez* recognized this factual difference with *Montanez* explicitly. *Enriquez*, 1998-NMCA-157, ¶ 113. Thus, *Enriquez* cannot be read

9

to alter or call into question the holding in *Montanez*.

**{36}**   In interpreting *Saiz*, we did observe that the "relationship between the owner/employer and the independent contractor is not, and should not be, the focus of the inquiry." *Enriquez*, 1998-NMCA-157, ¶ 103. But, again, that comment was made in the course of analyzing a factual scenario much different from the one present here. Further, we made clear that imposition of strict liability was a policy- driven inquiry and that undertaking inherently dangerous work does not necessarily require a finding of joint and several liability. *See Abeita v. N. Rio Arriba Elec. Coop.*, 1997-NMCA-097, ¶ 15, 124 N.M. 97, 946 P.2d 1108 (holding that an electrical utility that was held sixty percent liable for an electrocution on a construction job was not jointly and severally liable given that it had no power to actually halt work at the site).

**{37}**   In sum, neither *Saiz* nor *Enriquez* undermine the rationale and holding of *Montanez*. And, as we will discuss in the next section of this Opinion, the vast majority of cases addressing the issue agree with *Montanez*.

### 3.     The Great Weight of Authority From Other Jurisdictions Follows the *Montanez* Approach

**{38}**   As evidenced by the discussions and outcomes in *Montanez* and *Cass*, the status of employees of independent contractors as beneficiaries of the protection offered by the "peculiar risk" provision of the Restatement has been uncertain from the beginning. Dean Prosser, as the reporter for the 1965 edition of the Restatement (Second) of Torts, suggested a Special Note that would disallow claims by employees of independent contractors against owner/employers. *See* Restatement (Third) of Torts § 55 cmt. h (2012) (providing an overview of the history of the issue within the Restatement process and an overview of the case law). The Special Note was not included apparently because the case law was still in flux, though Dean Prosser did note that the "prevailing point of view is that there is no liability on the part of the employer of the independent contractor." *Id.*

**{39}**   In the fifty years since the 1965 version of the Restatement (Second) of Torts debuted, the prevailing view has only strengthened. The commentary to Section 57 of the Restatement (Third) of Torts—which replaces former Sections 416 and 427, among others—now flatly states that "[t]he hirer of an independent contractor is not subject to liability to an employee of the independent contractor under any of the vicarious-liability avenues in this [c]hapter." *Id.* cmt. d. And Subsection (d) of the Reporters' Notes to Section 57 states that the "vast majority of cases disallow claims by employees of independent contractors against hirers on vicarious-liability theories."

**{40}**   Our own research confirms this observation. We found only two cases allowing such claims against a general contractor under Sections 416 and 427 of the Restatement (Second) of Torts. *See Makaneole v. Gampon*, 777 P.2d 1183, 1187 (Haw. 1989); *Elliott v. Pub. Serv. Co. of N.H.*, 517 A.2d 1185, 1187-89 (N.H. 1986). It would serve little purpose to list all of

the contrary authority. The cases are, as they say, "legion." Representative of the cases holding that Sections 416 and 427 do not apply to personal injury claims by employees of subcontractors against general contractors or owners are: *Welker*, 403 P.2d at 335-38; *Privette v. Superior Court*, 854 P.2d 721, 727-29 (Cal. 1993) (in bank); *DeShambo v. Nielsen*, 684 N.W.2d 332, 339-41 (Mich. 2004); *Conover v. N. States Power Co.*, 313 N.W.2d 397, 403-05 (Minn. 1981); *Gaytan v. Wal-Mart*, 853 N.W.2d 181, 200-02 (Neb. 2014) (overruling prior case law allowing such claims); *Zueck v. Oppenheimer Gateway Props., Inc.*, 809 S.W.2d 384, 390 (Mo. 1991) (en banc).[2]

**{41}**     In contrast, the liability of hirers of subcontractors for their own negligence in the exercise of retained control is alive and well. Section 56 of the Restatement (Third) of Torts replaces Section 414 of the Restatement (Second) of Torts. New Mexico has recognized the applicability of Section 414 liability since at least our Supreme Court's opinion in *DeArman*. *See* 1965-NMSC-026, ¶ 21; *see also Valdez v. Cillessen & Son, Inc.*, 1987-NMSC-015, ¶¶ 16, 20-27, 105 N.M. 575, 734 P.2d 1258 (reversing summary judgment in favor of general contractor because there were genuine issues of fact as to the extent and nature of the control it has over injury-causing activity); *Moulder v. Brown*, 1982-NMCA-078, ¶ 16, 98 N.M. 71, 644 P.2d 1060.[3] Of course, such negligence claims based on retained control do not provide a basis for imposing joint and several liability.[4]

**{42}**     In sum, we conclude that *Montanez* still controls claims made by employees of subcontractors against property owners and general contractors. And neither *Saiz* nor *Enriquez* provide any basis for questioning its continuing vitality. As an intermediate appellate court, we cannot change or overrule *Montanez*. As such, there is no basis for

---

[2]The special concurrence proposes an employee centric approach to evaluating whether an activity should be considered inherently dangerous. The approach it suggests is contrary to the Restatement emphasis on "activities" rather than personal attributes of potential plaintiffs. In addition, it would be difficult to administer. Assessing the level of training and the capabilities of individual plaintiffs in the activity at issue would make inherent danger a question for the jury rather than the question of law it currently is. Here, for example, if Saenz had been a newcomer to the job, would the activity have been inherently dangerous as to him, but not to someone on the same job with more experience and training? Such issues are more appropriately handled by applying our normal and familiar rules of comparative negligence.

[3]We note that our Supreme Court cited *Montanez* with approval in *Valdez*. *See Valdez*, 1987-NMSC-015, ¶¶ 29-31. Justice Ransom, the author in *Saiz*, concurred.

[4]*Valdez* has likely been partially reversed. In *Tafoya v. Rael*, 2008-NMSC-057, ¶ 17, 145 N.M. 4, 193 P.3d 551, the Supreme Court recognized a limited cause of action for negligent hiring of a subcontractor in favor of an employee of the subcontractor. The Court was careful to point out, however, that the liability would be subject to normal comparative fault principles. *Id.* ¶ 22.

11

imposing joint and several liability on Ranack.

**JURY INSTRUCTION AND JURY VERDICT ISSUES**

**{43}** Plaintiff puts forth separate arguments concerning the jury instruction and the verdict entered by the jury. First, she argues that the district court erred in giving—over objection—an incorrect formulation of the wrongful death damages instruction and thus confusing the jury as to the proper allocation of damages between Saenz's estate and his survivors. Second, she argues that the jury's decision to award zero in damages to the estate is not supported by substantial evidence. We disagree with her first argument, but agree with the second.

**1.    The UJI 13-1830 NMRA Instruction Given Was Wrong but no Prejudice Is Apparent**

**{44}** UJI 13-1830 is the uniform instruction on the measure of damages in a wrongful death case. It includes, as a bracketed option, a paragraph on loss of consortium damages. *Id.* ¶ 6. It also includes bracketed language in its last paragraph that instructs the jury that it must not permit the amount of damages to be influenced by "the loss of the deceased's society to the family." This language is in direct conflict with the language describing loss of consortium damages. As a result, the Use Notes for UJI 13-1830 provide that "[i]f the personal representative is also the surviving spouse . . . the damages described in [I]tem 6 should be included and the bracketed material in the last sentence of the instruction should be excluded."

**{45}** Plaintiff's requested UJI 13-1830 instruction mistakenly included both provisions. Noting the mistake, Plaintiff pointed it out to the district court and asked that the latter material be deleted. Plaintiff cited concerns for jury confusion but did not cite the Use Note to the district court. The district court refused the request.

**{46}** Given the Use Notes, the instruction given to the jury was wrong. But, as Plaintiff notes, not every defective jury instruction, even one that deviates from the UJI, gives rise to reversible error. Plaintiff must demonstrate that the error created prejudice or harmed substantial rights. *Kennedy v. Dexter Consol. Sch.*, 2000-NMSC-025, ¶ 26, 129 N.M. 436, 10 P.3d 115. Our review is de novo. *Salopek v. Friedman*, 2013-NMCA-087, ¶ 16, 308 P.3d 139. And while we will resolve doubts in favor of the party claiming prejudice where an instruction is inconsistent with the UJI, *Kennedy*, 2000-NMSC-025, ¶¶ 26-27, we will not set aside a judgment based on mere speculation that the erroneous instruction influenced the outcome of the case. *Fahrbach v. Diamond Shamrock, Inc.*, 1996-NMSC-063, ¶ 31, 122 N.M. 543, 928 P.2d 269.

**{47}** Plaintiff argues that the jury's confusion was evident from the way it distributed the damages it did award—comparable amounts to each of the children, and a substantially greater amount to Plaintiff for loss of consortium, but zero to the estate. Plaintiff also relies

12

on the fact that toward the end of its deliberations the jury posed the following question: "Does 'total amount of damages to the Estate of Charles Saenz' include all amounts awarded to Virginia, Rob[in], and sons[,] or is it meant to be a separate amount?"

**{48}** We perceive no prejudice to Plaintiff from the jury instruction. The most natural kind of prejudice to be expected from the error would be a reduction in loss of consortium damages. But Plaintiff makes no argument that those damages were inadequate or even reduced as a result of the error. Rather, Plaintiff suggests that the jury may have awarded damages actually belonging to the estate to the individuals to somehow make up for a presumed belief that they could not award loss of society damages. On the face of it, this suggestion is mere speculation and provides no basis for setting aside the verdict.

**{49}** In any event, Plaintiff's suggestion is all but an impossible scenario. Unusually, we have in this case an indication of the jury's thinking. The jury question quoted above shows that the jury was thinking about the issue of division of damages. With all counsels' approval, the district court responded that the "[t]otal amount of damages to the Estate of Charles Saenz" is separate. Given the question and the answer, combined with the absence of any indication about confusion about loss of consortium damages, there is no basis to suspect that the jury apportioned any damages belonging to the estate to the individuals. Thus there is no basis to suspect, much less conclude that prejudice flowed from the UJI 13-1830 error.

**2.   There Is No Substantial Evidence to Support an Award of Zero Damages to the Estate.**

**{50}** Finally, Plaintiff argues that the district court erred in denying her motion for a new trial because the award of zero damages to the estate was contrary to the evidence. To the extent that Ranack argues that this contention was not preserved because Plaintiff failed to raise it before the jury was excused, we disagree. The rule stated in *Thompson Drilling, Inc. v. Romig*, 1987-NMSC-039, 105 N.M. 701, 736 P.2d 979, and its progeny applies only to challenges of a jury verdict based on inconsistency, ambiguity, or indefiniteness. In *Thompson*, the defendant argued that "the jury verdict [was] invalid because it [was] ambiguous and indefinite as to the amount of damages." *Id.* ¶ 5. Similarly, in *Ramos v. Rodriguez*, the appellant argued that "the special verdict form submitted by the judge omitted necessary language which thereby resulted in a jury verdict that was contradictory and inconsistent on its face." 1994-NMCA-110, ¶ 9, 118 N.M. 534, 882 P.2d 1047. In both cases, these arguments were not addressed on appeal because the appellant failed to raise them before the jury was discharged. *Thompson*, 1987-NMSC-039, ¶ 5; *Ramos*, 1994-NMCA-110, ¶ 13; *see also G & G Servs., Inc. v. Agora Syndicate, Inc.*, 2000-NMCA-003, ¶ 41, 128 N.M. 434, 993 P.2d 751 ("A litigant who fails to object to an alleged inconsistency in a jury's verdict before the jury is dismissed may be held to have waived any further challenge to the alleged inconsistency.").

**{51}** But this rule does not apply to motions for a new trial based on a lack of substantial

13

evidence under Rule 1-059 NMRA. Addressing a fact pattern similar to that here, the Alaska Supreme Court held that the

> rule [that a challenge to a verdict based on inconsistency is waived if not raised before the jury is discharged] has limited application here. The [plaintiff's] failure to raise the issue of inconsistency before the court discharged the jury precluded it from later asserting that the inconsistency entitled it to a new trial as a matter of law. But that failure did not strip the estate of its right to move for a new trial on the discretionary ground that the verdict was against the weight of the evidence.

*Kava v. Am. Honda Motor Co.*, 48 P.3d 1170, 1176-77 (Alaska 2002).

**{52}** Reaching a similar conclusion, the Kentucky Supreme Court explained that the difference lies in whether the verdict contains a "patent irregularity" or is a "complete verdict." *Cooper v. Fultz*, 812 S.W.2d 497, 499 (Ky. 1991), *abrogated on other other grounds by Cooper v. Leatherman*, 532 U.S. 424 (2001). In *Cooper*, the jury awarded damages for medical expenses but entered "0" on the line for mental and physical suffering on the verdict form. *Id.* at 498. On appeal, the Court considered "whether, by thus specifying a deliberate intention to make no award for one (or more) elements of damages, the jury has returned a verdict with a patent irregularity which is waived by failing to timely object, or whether this represents a completed verdict which is subject to challenge as inadequate on motion for a new trial." *Id.* at 499. It noted that the explicit entry of zero on the jury form differs fundamentally from leaving the form blank, stating, "it is futile to require a jury that has consciously inserted '0' or its equivalent to reconsider its decision. This is not the same situation as that created when a jury has left a verdict slot blank. Such a verdict is patently irregular or incomplete." *Id.* at 500 (internal quotation marks and citation omitted). Citing Kentucky's version of Rule 59, it went on,

> Where there is a patent deficiency or irregularity, the [rule requiring objection before the jury is discharged] should be followed. However, it is untenable to utilize that procedure where the jury has deliberately awarded nothing, despite the evidence and instructions to the contrary. Such a verdict is no more incomplete or irregular than had the jury inserted one dollar. It may be defective as contrary to the evidence and the law that relates to the adequacy of an award, but such a defect is one appropriate to be addressed by the trial court upon a motion for a new trial.

*Id.* (internal quotation marks and citation omitted).

**{53}** Other states have echoed this reasoning. The West Virginia Supreme Court explained that "[c]ritically, the objective that underlies the general rule of requiring that an objection to the verdict form must be made prior to the jury's discharge is to provide the trial court with an opportunity to 'cure' any alleged defect or irregularity in the form prepared by the

14

jury." *State ex rel. Valley Radiology, Inc. v. Gaughan*, 640 S.E.2d 136, 141 (W. Va. 2006). It went on to state that

> [n]o similar opportunity to cure is required for an inadequate award of damages . . . because a request for a new trial based on the inadequacy of damages is not a procedural objection to the verdict form, but a substantive objection to the amount of damages awarded in view of the evidence presented and the findings of the jury as to fault. Consequently, there is no basis for invoking the waiver rule . . . when the post-trial objection is solely to the adequacy of the damages.

*Id.*; *accord Ga. Farm Bureau Mut. Ins. Co. v. Hyers*, 661 S.E.2d 682, 683 (Ga. Ct. App. 2008) ("Failure to move for a directed verdict also bars the party from contending on appeal that he is entitled to judgment as a matter of law because of insufficient evidence. This failure does not, however, bar the party from contending that he is entitled to a new trial on that ground." (citation omitted)); *Clay v. Choctaw Nation Care Ctr., LLC*, 2009 OK CIV APP 35, ¶¶ 20-21, 210 P.3d 855, 860 (affirming the grant of a new trial where the movant failed to object before the jury was discharged, stating, "there was nothing irregular, incorrect, or confusing about the form of the verdict[,]" noting that "[t]he alleged error . . . [did] not involve the verdict's form, but its substance[,]" and finding no waiver).

**{54}** Plaintiff did not specify in her motion the rule under which she moved for a new trial. Consequently, we examine the arguments in the motion to determine which rule applies. *Century Bank v. Hymans*, 1995-NMCA-095, ¶ 10, 120 N.M. 684, 905 P.2d 722 ("The movant need not cite the provision authorizing the motion; the substance of the motion, not its title, controls."). In Plaintiff's motion, she argued that the jury's award of zero damages to the estate "was . . . against the overwhelming evidence propounded upon the [j]ury in this matter." A claim that the verdict is contrary to the clear weight of the evidence falls within the proper ground for a new trial under Rule 1-059. *See* Rule 1-059(A) ("A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted."); *see also Pool v. Leone*, 374 F.2d 961, 963 (10th Cir. 1967) (stating that the plaintiff's claim that the verdict was contrary to the evidence is a ground "recognized at common law and in the courts of the United States prior to the adoption of Rule 59(a) as proper grounds for the granting of a new trial"). Hence, we understand Plaintiff's motion for a new trial to invoke Rule 1-059 and conclude that her argument that the verdict was not supported by the evidence was not waived by her failure to object to it on these grounds before the jury was discharged.

**{55}** "The grant or denial of a new trial is a matter resting within the sound discretion of the trial court, and the reviewing court will not reverse absent a manifest abuse of that discretion." *Martinez v. Ponderosa Prods., Inc.*, 1988-NMCA-115, ¶ 4, 108 N.M. 385, 772 P.2d 1308.

15

**{56}** "We are of the opinion that proof of a wrongful death of necessity implies recoverable damages." *Baca v. Baca*, 1970-NMCA-090, ¶ 25, 81 N.M. 734, 472 P.2d 997. *Contra Marchese v. Warner Commc'ns, Inc.*, 1983-NMCA-076, ¶¶ 32, 35, 100 N.M. 313, 670 P.2d 113 (rejecting the plaintiff's argument that "one cannot find a life valueless in New Mexico" and stating that "the amount of damages is a correct one for the jury to decide"). Such damages may be based on, but are not limited to, pecuniary injury. *Baca*, 1970-NMCA-090, ¶ 25; *Stang v. Hertz Corp.*, 1969-NMCA-118, ¶ 8, 81 N.M. 69, 463 P.2d 45 ("Damages for the wrongful death may be recovered by proof of the present worth of life of decedent to the decedent's estate."), *aff'd* 1970-NMSC-048, 81 N.M. 348, 467 P.2d 14. Damages based on pecuniary injury to the estate are rarely zero. *Reffitt v. Hajjar*, 892 S.W.2d 599, 603 (Ky. Ct. App. 1994) (stating that it is not "proper in a wrongful death action to award nothing for destruction of earning power unless there is evidence from which the jury could reasonably believe that the decedent possessed *no power to earn money*" (internal quotation marks and citation omitted)); *see* Eric A. Posner & Cass R. Sunstein, *Dollars and Death*, 72 U. Chi. L. Rev. 537, 544 (2005) (stating that zero damages are appropriate for a "victim who has no future income, no dependents, and no spouse, and who dies without feeling pain" as a matter of "formal law," but that this rule is not always followed in practice). Even in the absence of pecuniary injury, however, the jury may also consider "[t]he present worth of the life, . . . [based on] the age, occupation, earning capacity, health, habits, and the probable duration of the life of decedent." *Baca*, 1970-NMCA-090, ¶ 25; *see* Posner & Sustein, *supra* (stating that New Mexico recognizes hedonic damages in wrongful death cases).

**{57}** In *Jones v. Pollock*, 1963-NMSC-116, ¶ 5, 72 N.M. 315, 383 P.2d 271, the Court considered whether a new trial should have been granted where the jury found the appellees liable for the appellants' injuries but awarded little or no damages for their medical costs incurred as a result of those injuries. The Court concluded that "[i]t does not stand to reason for the jury to have arrived at the determination that [the] appellees are liable for the injuries suffered by [the] appellants without it also finding that [the] appellants merited an award for the injuries." *Id.* ¶ 10. As to the amount of the award, the appellees argued that while they had stipulated to the total amount of the appellants' medical bills, they did not stipulate to the recoverable amount. *Id.* ¶ 9. The Court rejected this argument, stating that the "appellees cite no evidence in the record which would tend to lessen the amount which [the] appellants claim they incurred as a result of the accident. There was no controversy as to the amount of the medical expenses. The only evidence offered on this point was that submitted by [the] appellants." *Id.* There being no evidence tending to reduce the recovery for medical costs, the Court concluded that "where it is shown, . . . that the verdict of the jury on the question of damages is clearly not supported by substantial evidence adduced at the trial of the case, a motion for a new trial should be granted, and not to do so is an abuse of discretion by the court." *Id.* ¶ 12; *see Hammond v. Blackwell*, 1966-NMSC-258, ¶ 13, 77 N.M. 209, 421 P.2d 124 (holding that a new trial was required where the district court found the plaintiff suffered a loss of earning ability as a result of an accident but failed to award any damages for such loss).

**{58}** Here, Plaintiff presented evidence that Saenz was working at the time of his death

16

and that he was a competent and dependable employee making between $10 and $33 per hour. There was also evidence presented on Saenz's role in his family and his relationship with his wife and children. While there was evidence that Saenz's wage-earning capacity was mitigated by the fact that he had been convicted and incarcerated for a felony charge and that he had a fitful relationship with his wife, these factors could work to reduce the amounts Saenz might have earned or contributed to his family—they cannot cancel them out entirely. Having found that Ranack was forty-five percent at fault for Saenz's death, the jury could not find under the evidence presented to it that the damage to his estate was zero. The jury was free to settle on essentially any figure—ranging from a nominal sum to an amount akin to the amounts awarded to his survivors—but it could not under the evidence find zero damages. We conclude that an award of zero damages to Saenz's estate is not supported by the evidence and remand for a new trial as to damages to the estate only.

**{59}    IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**I CONCUR:**

_____

**TIMOTHY L. GARCIA, Judge**

**JONATHAN B. SUTIN, Judge**
**(specially concurring in part and dissenting in part).**

**SUTIN, Judge (specially concurring in part and dissenting in part).**

**{60}**    I do not disagree with the Majority's analysis and conclusion that *Montanez* precludes a holding that Ranack is jointly and severally liable for all of the damages found by the jury. Majority Op. ¶¶ 15, 26-42. I write separately to address what I believe to be an important issue raised in this case, namely, whether the work that Saenz was doing at the time of his death may be considered "inherently dangerous" as a matter of law. This issue was addressed by the district court, it is central to Plaintiff's argument on appeal, and in my view, it highlights an aspect of New Mexico case law that needs to be clarified. *See id.* ¶¶ 14, 21, 23. Additionally, I disagree with the Majority's decision to remand for a new trial as to damages to the estate, and as to that issue, I respectfully dissent. *Id.* ¶¶ 50-59.

**As a Matter of Law, Saenz Was Not Engaged in an Inherently Dangerous Activity**

**{61}**    Acting pursuant to Section 41-3A-1(C), in *Saiz*, our Supreme Court established a public policy exception to several liability. 1992-NMSC-018, ¶ 34. The *Saiz* Court began its analysis by recognizing the longstanding tort principle that, although an employer of an independent contractor is not generally responsible for the independent contractor's

negligence, the general rule has no application where, by virtue of work that is "inherently dangerous," the employer has a nondelegable duty to ensure that precautions are taken. *Id.* ¶¶ 10-12, 15. In order to serve the policy underlying the imposition of a nondelegable duty to ensure that safety precautions are taken in regard to inherent dangers, the *Saiz* Court determined that employers should be held strictly liable for injuries caused by the failure to ensure such precautions. *Id.* ¶ 33. This, in turn, would promote the "special public policy" of protecting "third persons in an area of inherent danger" and encouraging "conscientious adherence to standards of safety where injury likely will result in the absence of precautions." *Id.* ¶ 35. To effectuate these public policy considerations, the *Saiz* Court held that, pursuant to Section 41-3A-1(C)(4), "when precautions are not taken against inherent danger, the employer is jointly and severally liable for harm apportioned to any independent contractor for failure to take precautions reasonably necessary to prevent injury to third parties arising from the peculiar risk." *Saiz*, 1992-NMSC-018, ¶¶ 34, 36. I refer to this public policy exception in *Saiz* as "the *Saiz* exception."

**{62}** The *Saiz* exception was derived from Sections 416 and 427 of the Restatement (Second) of Torts. *Saiz*, 1992-NMSC-018, ¶¶ 11-14. Section 416 of the Restatement (Second) of Torts, "Work Dangerous in Absence of Special Precautions," provides that when one employs an independent contractor to do work that the employer "should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken," the employer is subject to liability for physical harm to "others" caused by the independent contractor's failure to exercise reasonable care to take the special precautions. This is so regardless of whether "the employer has provided for such precautions in the contract or otherwise." *Id.* The Restatement's illustrations of the application of Section 416 demonstrate that it was intended to apply to injured third parties who had no connection to the employer or to the independent contractor and who were injured through no fault of their own by virtue of the independent contractor's failure to take precautions for the safety of the general public. *See id.* cmt. c, e (illustrating the intended application of Section 416).

**{63}** Section 427 of the Restatement (Second) of Torts, "Negligence as to Danger Inherent in the Work," subjects an employer of an independent contractor to liability for injuries to "others" caused by the independent contractor's failure to take reasonable precautions against "a special danger" where the work for which the independent contractor was hired involves a "special danger to others which the employer knows or has reason to know to be inherent in or normal to the work[.]" Like those accompanying Section 416, the Restatement's illustrations of the application of Section 427 demonstrate that it was intended to apply to circumstances in which a third party, a member of the public, with no relationship to the employer or to the independent contractor was injured as a result of the independent contractor's failure to take precautions necessary to alert the public to a dangerous condition. *See id.* cmt. d (providing illustrations).

**{64}** Recognizing that Sections 416 and 427 were different formulations of the same principle, the *Saiz* Court synthesized the respective sections in its holding that "one who

18

employs an independent contractor to do work that the employer as a matter of law should recognize as likely to create a *peculiar risk* of physical harm to others unless reasonable precautions are taken is liable for physical harm to others caused by an absence of those precautions." *Saiz*, 1992-NMSC-018, ¶ 15 (emphasis added); *see id.* ¶ 12 n.6 (stating that work that presents a "peculiar risk" or "special danger"[5] is "inherently dangerous").

**{65}** Plaintiff argues that Saenz's work activity was inherently dangerous under the *Saiz* exception. Plaintiff's theory of inherent danger is based on an argument that the work activity that Saenz was performing when he died satisfies the three-part test established in *Gabaldon*, 1999-NMSC-039, ¶ 13, for evaluating whether an activity is inherently dangerous as a matter of law.

**{66}** To be considered inherently dangerous as a matter of law, the at-issue activity must present a "peculiar risk." *Saiz*, 1992-NMSC-018, ¶ 12 n.6 (stating that work is inherently dangerous because it presents a peculiar risk). In general, a "peculiar risk" is one that is outside the realm of personal experience, such that the person subjected to the risk is unfamiliar with the associated danger. *See Valdez v. Yates Petroleum Corp.*, 2007-NMCA-038, ¶ 11, 141 N.M. 381, 155 P.3d 786 (stating that personal experience with an activity that results in familiarity with its dangers defies a conclusion that the risks of the activity are peculiar). In the context of construction work, a peculiar risk is one that is "not routinely encountered in the contractor's line of work." *Sievers v. McClure*, 746 P.2d 885, 889-90 (Alaska 1987).

**{67}** Under the particular circumstances of this case, the work that Saenz was engaged in at the time of his death does not come within the legal definition of "inherently dangerous" work. Saenz was a skilled, experienced, and knowledgeable ironworker, equipped with fall-protection devices, aware of the hazards and required safety precautions of his trade, aware of normal routine matters of ironwork activity, and aware of the risk and hazard of falling from the height of an unfinished building. Furthermore, Saenz had worked on large construction projects, including having participated in the structural steel construction work of several buildings from the ground up.

**{68}** Saenz had trained both of his sons, Jason and Marcus, to be ironworkers. Jason testified that Saenz was "extremely safety conscious" and that Saenz had trained him in ironwork safety precautions, including how to use a harness, a beamer, and a lanyard, and eventually, how to work at heights. Marcus, who was working with Saenz on the day of Saenz's accident, testified that Saenz warned him "several times" not to work at heights or to walk across beams without being tied off. Saenz also advised his co-workers on safety

---

[5]The *Saiz* Court concluded that although the terms "peculiar risk" and "special danger" both appear in the Restatement, it would treat them as equivalent; following the Court's lead in *Saiz*, I do not distinguish these terms and, for simplicity, use the term "peculiar risk" exclusively. *See id.* ¶ 12 n.6.

matters, including "how to be careful[,]" "how to tie off[,]" and "how to make sure that [they] were working safely at the job."

**{69}** Both Ranack's and Alamo's employees were required to use fall protection, including a requirement to tie off when working from elevated areas, which, according to Ranack's policy, included any height over six feet. Thus, Saenz was required to be tied off when working at the height from which he fell. Evidence at trial established that the task that Saenz was attempting to perform when he fell could have been accomplished safely by, in keeping with the tie-off requirement, tying himself off to a joist or to the steel structure that was in place, or by using a ladder to reach his destination rather than walking across the concrete wall. Evidence at trial also showed that had Saenz tied off, he would have fallen no more than six feet before his lanyard would have arrested his fall. The foregoing factual presentation was credited both by the jury and by the district court.

**{70}** Owing to his knowledge and experience in regard to the dangers of the ironwork trade and the fact that he was skilled in guarding against the dangers, the risk of death or injury from falling was not "peculiar" to Saenz. *See Valdez*, 2007-NMCA-038, ¶ 11 (stating that personal experience with an activity that results in familiarity with its dangers defies a conclusion that the risks of the activity are peculiar); *see also Warnick v. Home Depot U.S.A., Inc.*, 516 F. Supp. 2d 459, 469 (E.D. Pa. 2007) ("All construction work involves a risk of some harm; only where the work is done under unusually dangerous circumstances does it involve a . . . peculiar risk." (internal quotation marks and citation omitted)); *Sievers*, 746 P.2d at 889-90 (holding that, in the context of construction work, a peculiar risk is one that is "not routinely encountered in the contractor's line of work" such that the employer of a contractor may only be held liable for "those hazards which the independent contractor is unlikely to be aware of and therefore unable to protect against"). To the contrary, Saenz was well aware of the risk of falling and the ever-present need to guard against that risk when working from heights. Because the presence of a peculiar risk is an inextricable element of "inherent danger," the circumstances here do not support a conclusion that Saenz was engaged in an inherently dangerous activity. *Saiz*, 1992-NMSC-018, ¶¶ 11, 12 n.6 (explaining that work is inherently dangerous because it presents a peculiar risk).

**{71}** Having concluded that the work that Saenz was performing does not come within the meaning of "inherent danger" as that term was used in *Saiz*, I further conclude that the three-part test established by the *Gabaldon* Court for evaluating whether an activity is inherently dangerous does not apply under the circumstances of this case. *See Gabaldon*, 1999-NMSC-039, ¶ 13 (establishing a three-part test to determine whether an activity should be considered "inherently dangerous" as that term was used in *Saiz*). Under the *Gabaldon* test, in order to conclude that an activity is inherently dangerous: (1) "the activity must involve an unusual or peculiar risk of harm that is not a normal routine matter of customary human activity"; (2) "the activity is likely to cause a high probability of harm in the absence of reasonable precautions"; and (3) "the danger or probability of harm must flow from the activity itself when carried out in its ordinary, expected way[.]" *Id.* Because they were derived from the *Saiz* definition of "inherent danger," the factors of the *Gabaldon* test

20

contemplated an unwitting plaintiff, a member of the general public, who is unable, by virtue of his lack of experience with the dangerous condition awaiting him, to guard against the risk presented by a dangerous condition. *See id.* ¶ 14 ("The first prong addresses the relative rarity of the activity and the concomitant lack of contact or experience with the activity and its dangers by the general public." (internal quotation marks and citation omitted)). In light of Saenz's knowledge and experience as an ironworking tradesman and that Saenz was a subcontractor's employee, instead of a third party, the *Gabaldon* three-factor analysis is too limited an analysis through which to evaluate Saenz's ironwork task. Even if the *Gabaldon* test were construed to apply to a circumstance in which the injured party was the employee of a subcontractor (contrary to *Montanez*), additional factors would have to be considered—particularly, the knowledge, skill, and experience of the injured party. Considering these additional factors would, for the reasons that I set forth earlier, lead to a conclusion that, under the circumstances of this case, Saenz was not engaged in an inherently dangerous activity.

**The District Court's Denial of Plaintiff's Motion for a New Trial Should Be Affirmed**

**{72}** On the special verdict form, the jury returned verdicts finding "the total amount of damages suffered by Plaintiff Virginia Saenz, Individually to be $482,000" and finding "the total amount of damages suffered by the Estate of Charles Anthony Saenz, Deceased, to be $0." The jury's verdict was read in open court. Plaintiff's counsel did not raise any issue in regard to estate damages prior to the discharge of the jury. Rather, the issue was raised for the first time more than two weeks after the trial ended, when Plaintiff filed a motion for a mistrial. In that motion, Plaintiff sought a mistrial in the post-jury-discharge proceeding based on an argument that, in arriving at the zero verdict for the Estate, the jury ignored "overwhelming evidence," somehow measured by a substantial evidence standard, constituting jury abuse of discretion, including jury bias, prejudice, or passion. Ranack asserted in response that the elements of possible injury to Saenz and his estate was vigorously contested and set out examples of Saenz's difficulties retaining employment, his criminal history, the impact of that history on his future employment opportunities, his having lived apart from his family while in prison and while not in prison, and his failure to support his offspring. The district court denied Plaintiff's mistrial motion, seemingly convinced that substantial evidence supported the verdict given the "number of items brought into evidence[,]" including "[t]he criminal history of this individual, the fact that he had just gotten out of jail some months earlier, so on and so forth."

**{73}** "The jury's verdict is presumed to be correct[,]" and "[w]hen the jury makes a determination and the trial court approves, the amount awarded in dollars stands in the strongest position known in the law." *Ennis v. Kmart Corp.*, 2001-NMCA-068, ¶ 27, 131 N.M. 32, 33 P.3d 32 (internal quotation marks and citation omitted). In this appeal, there exists no issue of bias, passion, prejudice, excessive verdict, or improper admission of evidence. There exists no contention of district court error in regard to the special verdict submitted to the jury. Plaintiff undisputedly did not preserve in the district court any concern with the special verdict. The jury was discharged with Plaintiff's full knowledge of the

21

verdict.

**{74}**     Instead of attacking the basis on which the district court concluded that substantial evidence existed, Plaintiff and the Majority rely on notions of an "inadequate" verdict, "contrary to the evidence," and "overwhelming evidence" of the jury's erroneous failure to award damages to the estate. Majority Op. ¶¶ 50-52, 54. The Majority buttresses its position with foreign (and in my view, inapplicable) authorities to support the assertion for the case at hand that the waiver rule does not apply. Ranack relies on *Thompson*, 1987-NMSC-039, ¶ 11, for the proposition that by failing to object to the jury's verdict or otherwise alert the district court to the alleged error prior to the jury's dismissal, Plaintiff waived the opportunity to raise any claim of error in regard to the amount of estate damages. I agree with Ranack. *See id.* ("[T]he right to object to an improper verdict is waived when not made at the time of the verdict and cannot be reclaimed and revived by resorting to a motion for a new trial or on appeal."). For the reasons that follow in this dissent, the denial of Plaintiff's post-jury-discharge motion can and should be upheld, if not based on substantial evidence as determined by the district court, then, contrary to the Majority's analysis, because Plaintiff failed to preserve an attack on the jury's verdict and the fault lay not in verdict inadequacy but in Plaintiff's litigation approach or failures.

**{75}**     Embedded in New Mexico law is the requirement that a party object to an improper verdict before the jury is discharged, and that the party that fails to object waives the right to a new trial after the jury's discharge. *Id.*; *Guest v. Allstate Ins. Co.*, 2009-NMCA-037, ¶ 36, 145 N.M. 797, 205 P.3d 844, *reversed in part on other grounds by* 2010-NMSC-047, 149 N.M. 74, 244 P.3d 342; *G & G Servs., Inc.*, 2000-NMCA-003, ¶¶ 40-42; *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 39, 125 N.M. 748, 965 P.2d 332; *Ramos*, 1994-NMCA-110, ¶ 13; *see also Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 806 (9th Cir. 1984) (recognizing that failure to object to a no-damages verdict at the time that it is read constitutes a waiver of any future objections to the form of the verdict and further stating that in the federal system "failure to award damages does not by itself render a verdict invalid"); *Balderas v. Starks*, 2006 UT App 218, ¶¶ 17-19, 138 P.3d 75 (stating that a failure to object to the sufficiency or legality of a verdict before the jury is discharged constitutes a waiver of the objection and recognizing that the waiver rule avoids "the expense and additional time for a new trial by having the jury which heard the facts clarify the [matter] while it is able to do so" (internal quotation marks and citation omitted)).

**{76}**     In *Diversey*, this Court explored whether a fundamental error could override the failure to timely object to an ambiguous verdict. 1998-NMCA-112, ¶¶ 36-40. The question of ambiguity involved whether the use of "and/or" in an instruction rendered the jury's verdict ambiguous with the consequence that the jury improperly awarded a double recovery for the same injury. *Id.* ¶ 36. The Court determined that fundamental error generally did not apply in civil cases and limited any exception to waiver to specific "exceptional circumstances" found in four specific cases. *Id.* ¶ 40 (stating that fundamental error may be found in civil cases in which "substantial justice was not done, the court was deprived of jurisdiction to hear the case, the issue was one of general public interest that would impact

22

a large number of litigants, or[] there was a total absence of anything in the record of the case showing a right to relief" (internal quotation marks and citation omitted)). None of the exceptional circumstances exist in the present case. Furthermore, Plaintiff created all of which she now complains.

**{77}** The jury was instructed based on UJI 13-1830 that "[t]he lawsuit has been brought by Virginia Saenz, Individually and on behalf of the estate of . . . Saenz, who is now deceased." This instruction was adopted verbatim by the court from Plaintiff's requested UJI 13-1830 which she modified, substituting "on behalf of the surviving beneficiaries" with "on behalf of the estate[.]" The term "estate" was not defined for the jury in any jury instruction. The special verdict form given to the jury was likewise, in pertinent part relating to damages, adopted from Plaintiff's requested special verdict form. Plaintiff's requested special verdict form given to the jury did not carry out UJI 13-1830's use note suggestion that the "various elements of damages . . . be broken out separately on the special verdict form . . . in order to identify damages recoverable by the estate" as distinguished from those recoverable by the decedent's spouse and beneficiaries for loss of consortium. Thus, neither the UJI 13-1830-based instruction nor the special verdict form as given to the jury at Plaintiff's request explained the distinguishing factors inherent in "Virginia Saenz, Individually and on behalf of the estate," as those words appeared in the instruction, or "Virginia Saenz" as the "surviving spouse," as those would have appeared in an unmodified UJI 13-1830. And, importantly, Plaintiff did not point out or explain to the jury any differences or distinguishing factors about damages recovery in closing argument.

**{78}** Plaintiff's UJI 13-1830-based instruction could easily have given an impression to and reasonably have been interpreted by the jury to say that Virginia Saenz was entitled to one recovery encompassing both her individual and representative capacities. Plaintiff's special verdict form did not clarify potential recoveries. The special verdict form provided a blank space for damages "suffered by Plaintiff Virginia Saenz, Individually[,]" which, given the way the instruction read, namely, "Individually and on behalf of the estate," could reasonably be read as calling for recovery of one amount consisting of damages in both capacities. Nowhere in the special verdict form was there a separate place for the jury to consider damages recoverable by "Virginia Saenz on behalf of the estate." Further, Virginia Saenz as "surviving spouse" appears nowhere in the special verdict form. In awarding zero as "damages suffered by the Estate of Charles Anthony Saenz" (with "the Estate" nowhere described, nowhere differentiated from "Virginia Saenz, Individually," and nowhere indicating whether the award should be given to Virginia Saenz in her "on behalf of the estate" capacity) the jury could reasonably have concluded from the instructions, the special verdict form, and the lack of any explanation to the jury by Plaintiff, that its award of $482,000 properly included all of the compensation for "Virginia Saenz, Individually *and* on behalf the estate" according to Plaintiff's UJI 13-1830-based and modified instruction. (Emphasis added.)

**{79}** During its deliberations, the jury sent a note to the court asking the following question: "Does 'total amount of damages to the Estate of . . . Saenz' include all amounts

23

awarded to [Plaintiff and the children] or is it meant to be a separate amount?" This question lacked clarity. Given the manner in which Plaintiff had the jury instructed, including how her special verdict form read, the question could reasonably be interpreted as asking not whether there should be separately awarded damages pursuant to a division or distinction between "Individually" on the one hand and either "on behalf of the estate" or "the Estate" on the other hand, but whether, upon or after an award "of all amounts" to Plaintiff, individually and on behalf of the estate (and to the children), the Estate was still to receive a separate amount. The court consulted counsel for both parties regarding how to respond to the question. Initially, Plaintiff's counsel suggested sending the jury an answer saying: "Yes." To which the court astutely responded that the problem with that answer would be that the jury would then ask, "What is the estate entitled to?" The court insightfully explained, from "looking at the damages instruction for wrongful death, . . . I am not quite sure if it itemizes the damages for the estate." The court instructed counsel to recess and look at the issue to figure out a way to respond to the note. Counsel returned with an agreed upon answer for the jury, still lacking in clarity, that read, "It is separate[,]" which the court suggested be slightly modified to state, "The 'total amount of damages to the Estate of . . . Saenz is separate." Both parties agreed to the court's modification and that answer was submitted to the jury.

**{80}**    The evidence at trial was that the value of Saenz's lost wages over the remainder of his working lifetime was estimated to be $450,000. No other dollar amounts were in evidence with respect to damages. On the face of the special verdict form, the jury awarded $482,000 in damages "suffered by Plaintiff Virginia Saenz, Individually[.]" And the jury awarded damages "suffered by" the children: to Saenz's daughter, $50,000 and to each of Saenz's sons, $25,000. The special verdict form made no mention of "consortium."

**{81}**    It is reasonable to conclude that the $482,000 award to Plaintiff, individually, indicates that the jury likely included in the award "all amounts awarded to [Plaintiff]"—that is, all amounts that would flow to her "Individually and on behalf of the estate," as instructed. This conclusion is supported, among other things, by the fact that the jury asked: "Does 'total amount of damages to the Estate of . . . Saenz' include all amounts awarded to [Plaintiff and the children,] or is it meant to be a separate amount?" The question of how much of any intended award to Virginia Saenz on behalf of the estate should flow to her as a wrongful death beneficiary under the Wrongful Death Act and how much should be allocated to Virginia Saenz, individually, for loss of consortium, is not suggested or argued by Plaintiff on appeal. *See generally* NMSA 1978, § 41-2-3 (2001) (governing the distribution of the proceeds of a wrongful death judgment).

**{82}**    Under the circumstances, one can reasonably assume that the jury's award of $482,000 to "Virginia Saenz, Individually" represented more than the value of Plaintiff's loss of consortium, given Plaintiff's evidence of economic damages of $450,000. It is reasonable to conclude that, within its $482,000 award, the jury included damages to Plaintiff in both capacities, individually and on behalf of the estate, based on the instruction and special verdict form given to the jury, Plaintiff's counsel's misunderstanding or

24

misinterpretation of the jury's question and failure to ask the court to inquire further, and counsel's failure or decision not to explain to the jury the distinctions and differences in Plaintiff's capacities, the damages elements, the commensurate recovery rights, and how the jury should read and complete the special verdict form. It is likely that the jury did not intend to award $482,000 to Plaintiff solely for consortium.

{83} The outcome in this case is not a fault of the district court, and it does not fall within any of *Diversey*'s alternatives to fundamental error. *See* 1998-NMCA-112, ¶¶ 36-40. The outcome was the product of Plaintiff not having assured that the jury was properly and carefully instructed on the damages elements and the different capacities and recoveries, together with a conforming special verdict form.

{84} The Majority holds that a failure to timely object, before the jury was discharged, to an inadequate damages award and particularly a zero damages award, as opposed to an inconsistent or ambiguous verdict, does not constitute a waiver. Majority Op. ¶¶ 50-53. New Mexico has not addressed that issue. As noted by the Majority, on the waiver issue, cases outside New Mexico have made a distinction between verdicts with alleged inadequate damage awards and verdicts that are inconsistent with respect to such awards. *Id.* ¶¶ 51-53.

{85} The Majority's reliance on foreign case law is misplaced. *See id.* ¶¶ 51-54. Each foreign authority is distinguishable for several reasons. In none of the authorities on which the Majority relies was there complicity by the plaintiff in submitting a defective or ambiguous jury instruction and special verdict form and, as here, in perpetuating a misunderstanding of the jury's question. In none of the relied upon authorities does it appear that the plaintiff failed in closing argument to explain how to decide what to award. In none of the authorities was there a special verdict awarding substantial compensatory damages considerably close in amount to the evidence of economic damages presented in the case and reasonably interpretable to include loss of consortium. In none of the authorities was a sum awarded to a plaintiff in a wrongful death case "individually" when the award rationally could have been intended by the jury, based on its reading of the instructions and verdict form, to cover not just damages "individually" (for consortium) but also "on behalf of the estate."

{86} *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003), is significantly factually different from our case, and when carefully analyzed, supports this dissent. *Zhang* shows that the special verdict in our case consisted of two legal conclusions of damages and that, despite the claimed inconsistency, the verdict should stand. *Zhang* also makes clear that with general verdicts or legal conclusions in a special verdict form, such as in the present case, a party can waive a sufficiency of evidence argument when the issue does not involve factual findings of the jury in a special verdict circumstance, as here, but instead involves legal conclusions as to damages. 339 F.3d at 1031-34. Further, and significantly, the *Zhang* court stated:

> Another persuasive line of cases involves discrepancies between findings of

25

liability and damage awards, typically arising when a jury finds liability but nonetheless awards zero damages. . . . [T]he damage award is not really a separate general verdict, but it is nonetheless a legal conclusion, and so these types of cases involve purported conflicts between two legal conclusions. . . . Justice Brandeis wrote that the trial court's refusal to grant a new trial cannot be held erroneous as a matter of law. Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct. This rule retains vitality, and we have noted that the federal rule is that failure to award damages does not by itself render a verdict invalid.

*Id*. at 1036 (internal quotation marks and citations omitted).

**{87}** The outcome here stemmed from the lack of clarity of the UJI 13-1803-based instruction and the special verdict form, from the inadequate understanding of and response to the jury question, and from the failure to explain to the jury in closing argument how the awards should be made and divided, including what the "Estate" as shown in the special verdict form meant, as opposed to what "Virginia Saenz, Individually and on behalf of the estate" (as stated in the modified instruction) meant. This footprint of complicity is the culprit here, not verdict inadequacy.

**{88}** Further, it simply cannot be disputed that the several problems created by Plaintiff could have been resolved if, upon hearing the zero damages verdict for the estate along with the substantial award to Plaintiff, individually, Plaintiff had raised the issues at the time. This would have given the district court the opportunity to consider ways in which the jury could be further instructed or the parties could make further argument to clarify and resolve questions about the verdict.

**{89}** This case is not about exceptional circumstances, and there is no clear inadequacy in the verdict that should give rise to a new trial. This case was fully and fairly tried before a jury by experienced counsel. The district court did not abuse its discretion or otherwise err in denying Plaintiff's motion for a new trial. *See id.* (stating that where a jury finds liability but nonetheless awards zero damages, the "refusal to grant a new trial cannot be held erroneous as a matter of law [because a]ppellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct" (internal quotation marks and citation omitted)).

**{90}** In conclusion, I fully understand and am sympathetic with the difficulties even experienced litigators have in the vicissitudes, challenges, and surprises in the litigation arena. Attorneys must be immediately aware of the problematic occurrences. They must make on-the-spot decisions. Litigators ought not to enter into the fray without careful thought about every aspect of trial, from anticipating evidentiary issues, to readiness in making clear objections, to anticipating and perceiving error, to assuring clear, correct, and complete jury instructions and special verdict forms, to anticipating jury misunderstanding

of instructions and forms, and to jury error. It should be the rare instance in which this Court overturns, in a fully and fairly tried case, what appears to be an ambiguous or unclear jury verdict, or even one that may appear to be inadequate, but, as here, stems from the complaining party's own steps or mis-steps. This Court should not be in the business of saving parties from their trial strategies or mis-steps and forcing complete new trials on trial courts and prevailing parties under these circumstances.

_____
**JONATHAN B. SUTIN, Judge**